PEOPLE *v.* CONNOR.

*(Supreme Court, General Term, First Department.* April 18, 1890.)

**1. RAPE—RESISTANCE—EVIDENCE.**

Prosecutrix, a girl not quite 17 years old, testified that at the time the rape was committed she was alone with defendant, in his intelligence office, having remained after the other girls had left, on his suggestion that employers might come in; that defendant suddenly seized her, and carried her into a back room, locked the door, and pulled out a bench from the wall, holding her fast all the while; and that she struggled and kicked to get defendant off. Defendant gave testimony as to affirmative consent, which was palpably false. *Held,* that there was sufficient evidence of resistance to go to the jury, though prosecutrix made no outcry.

**2. CRIMINAL LAW—REMARKS OF TRIAL JUDGE.**

A defendant, having permitted evidence of an *alibi* to be considered by the committing magistrate, and having also allowed his counsel to offer like testimony on the trial, cannot complain of a statement by the trial judge that the prosecution claimed that there was an attempt to prove an *alibi.*

**8. SAME—PREJUDICE OF JURY.**

The indignation aroused in the minds of the jury on a trial for rape by defendant's false testimony as to affirmative consent is not "prejudice" for which the conviction will be disturbed.

Appeal from court of general sessions, New York county.

Patrick W. Connor was found guilty on an indictment for rape, and appeals.

Argued before VAN BRUNT, P. J., and BARTLETT and BARRETT, JJ.

*Edwin R. Leavitt,* for appellant. *McKenzie Semple,* for the People.

BARRETT, J. A calm and impartial consideration of the case made by the prosecution required that the jury should distinguish between so much of the defense as indicated a consciousness of guilt and so much as merely maligned the prosecutrix. Whether the jurors were successful in that mental effort it is, of course, impossible to say with absolute certainty. We know, however, that they were earnestly warned against prejudice or sympathy. We know, too, that the learned judge who presided over the trial carefully eliminated all false or irrelevant issues, and put the crucial question—that of resistance— to the jury with great clearness and marked consideration for the defendant's rights. He told the jury that, even if they disbelieved the defendant and credited the prosecutrix, there was still a serious question for them to determine, and that was whether or not she resisted to the extent of her ability at the time and under the circumstances; whether, in fact, she made "that resistance which the law requires from a person who claims to have been ravished." What physical acts and efforts are ordinarily comprehended in such resistance were fully and accurately pointed out; illustrations were furnished of malicious prosecutions for this crime; the fact was adverted to, that a man always stands at a disadvantage when he is thus charged; and great caution and scrupulous care in weighing the evidence were impressed upon the jury. At the close of the case, a motion to direct a verdict of acquittal was denied in terms quite favorable to the defendant; the learned judge observing, in the hearing of the jury, that, in the light of the undisputed evidence in the case, he was frank to say that it was not unattended with difficulty, and that he should throw the responsibility upon the jury of saying whether it was a case of rape or not. The defendant, therefore, cannot complain of the conduct of the trial, nor of the manner in which the case was submitted to the jury. If, notwithstanding these earnest appeals, the judgment of the jury was warped, it was not, probably, because of the nature of the charge, but because of the disgraceful and utterly incredible defense to which the defendant testified. It is clear that the defendant intended to rely upon an *alibi* until the well-corroborated story of the prosecutrix was developed. Such was the course pursued before the police magistrate, and such was apparently the course originally contemplated upon this trial.

Before the district attorney opened the case, the defendant asked leave to examine "a going witness provisionally." The request was granted, and a witness named Daniel S. Wilson was then called. This witness testified to the defendant's good character, and also to facts tending to establish an *alibi*, and having no other tendency. When the prosecution rested, the defendant's counsel attempted to proceed, without opening the defense. A colloquy as to the propriety of an opening ensued between himself, the court, and the district attorney, in which it was suggested that the testimony of Wilson was put in for the purpose of establishing an *alibi*. The defendant's counsel protested against this suggestion, and declared that he had not intimated in any way what his client's defense would be. He added that the defense was that the case lacked all the essential elements of rape. Upon that the district attorney inquired how, then, Wilson's testimony was material, and the defendant's counsel answered by a query: "Supposing the counsel was mistaken by a subsequent examination of the case?" Having thus determined to abandon the line of defense upon which alone Wilson had been called,—for there was no other evidence of good character, and the questions on that head put to Wilson were purely incidental,—the defendant went upon the stand and acknowledged that he had had connection with the prosecutrix, but insisted that she had solicited him, and that her present accusation was made for revenge, because of his temporary inability to pay her the agreed price of her shame. The girl was a virgin intact, not quite 17 years of age. The defendant was a man of 50. He would have had the jury believe that this chaste and inexperienced maiden made advances to him, bargained away her virginity for a few dollars, locked the door, pulled down a shade, placed herself conveniently upon a bench, looked in her pocket for a pair of scissors with which to effect an aperture in her drawers, told the defendant—not finding the scissors—that he might tear the drawers open, and then quietly submitted to what was necessarily his painful embrace.

The patent falsity of this story may well have affected the minds of the jury. If the feeling thus engendered is to be deemed prejudice, it was the natural consequence of the cowardly character of the defendant's calumny, delivered, as it was, under the solemnity of an oath. The just indignation aroused by the defendant's misconduct upon the witness stand is not the kind of prejudice for which courts are called upon to set aside verdicts. If it were otherwise, it would be a temptation to criminals to create the prejudice, in order to seek relief therefrom. But we are not prepared to say that "prejudice" is here the right word. The untruthful defense, coupled with the facts which preceded the trial, tended strongly to show consciousness of guilt. The attempted and plainly fabricated *alibi;* the defendant's statement to the doctor that "he did not understand the nature of the offense, and did not know it was a felony;" and the false testimony as to affirmative consent,—all indicated this guilty consciousness. It is true that two inferences might have been drawn from all this. Such facts may indicate merely the consciousness of a grossly immoral act, but they may also indicate the consciousness of the crime charged. It was for the jury to say which of these two inferences was the true one. If they believed that the just inference was a consciousness on the defendant's part that he had violated the prosecutrix, it was by no means "prejudice" to consider her testimony in the light of this consciousness. It was, on the contrary, a proper means of arriving at a just conclusion on the main question, namely, whether, under all the circumstances, the prosecutrix resisted the defendant to the extent of her ability on the occasion in question. The latter is the test of rape.   *People* v. *Dohring*, 59 N. Y. 374.

And this brings us to the consideration of the only serious question in the case:   Did the prosecutrix thus resist? That she never consented is entirely clear. That her submission did not follow a mere show of resistance is equally clear. The contention seems to be that her resistance was insufficient, be-

cause unaccompanied with certain stereotyped acts, the importance of which is frequently adverted to in the books. The prosecutrix truthfully acknowledged that she uttered no cries, nor did she "bite, scratch, or kick" the defendant. The appeal really rests upon the absence of these special *indicia* of resistance. The jury believed, however, and the evidence justified that belief, that, notwithstanding the absence of these forms of physical expression, she did resist to the extent of her ability, at the time and under the circumstances. It was well said in *People* v. *Dohring, supra*, that "the phrase, 'the utmost resistance,' is a relative one, and the resistance may be more violent and prolonged by one woman than another, and in one set of attending physical circumstances than another. In one case a woman may be surprised at the onset, and her mouth stopped so that she cannot cry out, or her arms pinioned so that she cannot use them, or her body so pressed about and upon that she cannot struggle." So, in *People* v. *Clemons*, 3 N. Y. Crim. Rep. 565, it was said that "what is the utmost resistance has relation to the circumstances attending the transaction. If she was overpowered by force, and was unable for want of strength to actively resist any longer, or if such resistance was absolutely useless, the crime may have been committed." That case presents some features similar to those now under consideration. The prosecutrix there said that she neither bit, struck, nor kicked the defendant, nor pulled his hair, and that she was scared. She did cry out, however, but her cry was stifled by the defendant's putting his hand over her mouth. It was further said in that case that the evidence did not show much active resistance upon her part after she was thrown upon the bed; that such "evidence permitted the conclusion that she may have done more than she did by way of physical resistance on the occasion. So far as appears, she had the free use of her arms and hands; and what use, if any, she made of them, does not appear; nor does it appear that she could have made any effectual use of them by way of attack or resistance." Nor did there appear in that case to have been any threat of bodily injury to awe the girl into a helpless condition, but she said that "she was frightened and afraid of him." The learned court finally summed up its conclusion in these apt words: "It does not appear by any evidence that she was overcome by exhaustion or fear, further than may be inferred by the circumstances and situation in which she was suddenly placed by the attack made upon her. That she was held helpless, and resistance was absolutely useless, after she was thrown upon the bed, does not appear, other than by her statement that the defendant held her there, and the fact of his greatly superior strength. We find no evidence of any effort on her part to release herself from him, or resist his attempt to have intercourse with her. It may be that his strength was so far superior to hers that she was but a feeble child in his grasp, and that the pressure of his weight upon her, and the force by which she was held in the situation in which she was, completely disabled her for any effectual resistance. The fact that it occurred in the night-time, with no other persons in the house, and with no means or opportunity or hope on her part of obtaining any assistance, may be entitled to some consideration. Her comparative weakness may have given her no hope of relieving herself from the infliction of the shameful wrong and injury which the defendant had the purpose and power to perpetrate upon her. If the situation was such that she was entirely helpless to resist the act, and it was throughout against her will and consent, and without any submission on her part, other than that which the force by him occasioned, it is difficult to see why the case did not properly go to the jury on the main charge in the indictment."

The evidence of resistance is certainly stronger in the present case than it was in either of those cited. The prosecutrix here was seemingly overwhelmed by the suddenness of the attack. She was in an intelligence office where the defendant was employed. They were entirely alone. She wished

to leave when the other girls left, (about half past 3 P. M.,) but the defendant persuaded her to remain, upon the assurance that employers often came in as late as half past 4. There were three rooms in the establishment,—a front office, a middle room, where the girls were accustomed to wait, and a rear room. Shortly after defendant's suggestion as to waiting, the prosecutrix stepped from the middle room into the front office, and told the defendant that she was going home. The defendant again said she had better wait a little longer, and she replied that she would wait until 4 o'clock, and no longer. She then turned to go back into the middle room, but before she could do so the defendant got up from his chair, locked the front door of the office, pulled down the shade, and then put both his arms around and attempted to kiss her. She told him to stop, and let her go. Whereupon, to quote her language, "with that he picked me right up off my feet, and took me in the rear room,—the last room. He carried me through the middle room, where I had been sitting, into the room beyond that, through a large door-way. I had not been in that room before. When he got me into that room, there was a bench that was along-side of the side there, and he pulled the bench out from the wall, and put me on the bench, and held me right down, with his left hand on my chest. He then put my limbs one on each side of the bench, and he raised my clothes, and then he unfastened his pants, and took out his person. Then he got on top of me, and he put his person in me. The drawers I wore buttoned on each side. They are called ' closed drawers.' He tore the drawers from the leg up. I felt hurt when his person touched my person. I felt his person penetrate my person. *Question.* Were you in pain? (Objected to as leading.) *Answer.* Yes, sir."

She further stated that she was frightened when the defendant took her in his arms, and dragged her back into the room; that she then struggled and resisted him, and tried with all her efforts to get away from him; that she vainly tried to unfasten his hands and arms from about her person, so that she could get away from him; that she continued to use those efforts up to the time that he laid her down upon the bench; that while he was pulling out the bench he held her so fast that she could not get away; that while he was lying upon her upon the bench she struggled with him, and tried to push him off with both her hands; that she tried to prevent his separating her limbs, and kicked with her feet; that the defendant, when he held her down, pressed down with great force, and leaned on her with all his body, and his hands, too; that she struggled to get away, and tried to get up, but was unable to; and that she made an attempt to roll off the bench, but could not get off. It seems to us that there was here sufficient evidence to go to the jury on the question of resistance. Coupling this evidence with the tearing open of the poor girl's drawers, the great violence used in the rupturing of the hymen, the victim's immediate disclosure of the defendant's acts, the attitude which he thereupon assumed, his statement to the physician that he did not understand the nature of the offense, and his evident consciousness of guilt, as evinced by the nature of his defense and the falsity of its presentation, we are upon the whole satisfied that the verdict was right. We think, too, that adequate reasons, resting in fact, were given for the failure to make an outcry. In the first place, it would probably have been futile, for there was no one in any of the rooms save the prosecutrix and the defendant. The outer door was locked, and the girl could have had no reasonable hope of bringing any one to her assistance. But, further, she was not herself. She was dazed by the suddenness of the attack, and by the rapidity and force with which she was swept into the rear room. She was evidently a timid and simple-minded creature. She was closely interrogated by the defendant's counsel as to her reasons for not crying out. In answer to these inquiries, she said that she was frightened; that she hardly knew what she was doing; and that she seemed to be dazed. The following questions were then put, and following

answers given: "*Question*. You preserved your senses—recollected completely—didn't you? *Answer*. Well, not quite. *Q*. Then if you had not preserved your senses and your recollection, how do you pretend to tell the jury here what took place? *A*. Because I had just sense enough to remember." Of her entire truthfulness we have not the slightest doubt. The conclusion, therefore, is reasonable that her breath was, so to speak, taken away by the suddenness and violence of the defendant's onset; that her faculties were overpowered, her mind clouded, and her whole being stunned. Fortunately the law, while exceedingly strict in its general requirements, as already stated, lays down at this point no precise or detailed formula, furnishes, in fine, no primer on the *data* of resistance, to be conned by pure and innocent maidens, in anticipation of brutality and outrage. Each case must rest upon its own peculiar facts and circumstances. The jury see the parties and hear their stories. It is their duty to note and consider the manner, idiosyncracies, and temperaments of witnesses. Methods of resistance suitable to one nature may be entirely foreign to another. The weak, the timid, and the ignorant may faint into submission, or fall into semi-consciousness, where strong, more resolute, and more experienced women would successfully cope with the ravisher. Upon the whole, and after a careful and anxious consideration of this branch of the case, we have reached the conclusion that the lack of outcry was not necessarily fatal to the prosecution, and that, notwithstanding its absence, the question whether the prosecutrix made the utmost resistance possible at the time and under the circumstances was properly submitted to the jury; and with their verdict we have no fault to find.

There are one or two minor points raised by the appellant which should be briefly considered. One involves a misconception of the evidence. The prosecutrix did not say that she remained "passively" upon the bench while the defendant was consummating the act. The question was put to her, "Then you remained passively upon it?" but that question was never answered. It was immediately followed by an inquiry from the learned judge whether the prosecutrix knew what the word "passively" meant. She replied that she did. Notwithstanding this answer, the meaning of the word was still further explained to her, as follows: "*Question*. Quietly, without resistance, etc., that is what he means; passive, without resistance; passive is to remain quiet and quiescent. *A*. Yes, sir." The answer here is simply that she knows the meaning of the word as thus expounded, not that she remained upon the bench "quietly, without resistance," etc. It appears that the subject was not further pursued, the original question was not pressed, and the answer consequently was not given. It is claimed that the learned judge erred in telling the jury that, "by the law of the state, a man who has sexual intercourse with a female not his wife, under sixteen years of age, commits rape upon her." This was an accurate view of the statute as amended in 1887, (Laws 1887, c. 693,) and the learned counsel for the appellant must have overlooked this amendment. Before the amendment, the age of consent was 10 years, but the amendment extended that period to 16 years.

The correctness of the observations made by the learned judge in his charge, as to the people's claim that the defendant intended to set up an *alibi*, is shown by what we have already said upon this subject. He in truth said much less than the facts warranted; for the defendant, upon cross-examination, while denying his responsibility for the defense of an *alibi*,—as made before the magistrate,—was compelled to admit that he was present at the examination, and then and there heard several witnesses, who were called on his behalf, testify that he was at another place "than this intelligence office at the time in question." He sat silently by while this testimony was being given, and permitted it to be weighed by the magistrate upon his behalf. He also, as we have seen, permitted his counsel to prelude this trial with similar testimony. Under such circumstances, the language of the learned judge

was exceedingly mild. When the defendant's counsel excepted to this language, the following observations were made by court and counsel: "*The Court.* If I said so, I will correct that. Where he attempts to prove a fabricated and false *alibi*, and you are satisfied his *alibi* is fabricated, and known to him to be false, then it is an inculpatory circumstance. He may honestly fail to prove a true *alibi*, and then it would not be an inculpatory circumstance. It must be a failure to prove an *alibi* which defendant knew to be false and fraudulent. In that case it will be an inculpatory circumstance against him. *Counsel.* I still further except to your honor stating anything to the jury about there being any attempt or intention on the part of this defendant to prove an *alibi*. *The Court.* I say the people claim that there was an attempt to do so; I do not say there was such an attempt." This reduced the learned judge's observation to a mere statement of the people's contention. It was absolutely colorless and harmless.

There is nothing in the point as to the admission of testimony regarding the examination by the police of the defendant's clothing, and the discovery thereon of blood-stains. There was no objection to this testimony, and even if there had been it was clearly competent,—quite as competent as testimony in a murder case that the prisoner had been searched, and a knife or pistol found upon his person. The testimony here did not comprehend the examination and exposure of the defendant's person. It was confined to his linen. It is true that the police officer Lawless says that he "examined the defendant and his clothing," but his testimony is confined exclusively to the blood-stains which he found upon the defendant's shirt and under-shirt. Such cases as *People* v. *McCoy*, 45 How. Pr. 216, have therefore no applicability. For these reasons the judgment should be affirmed. All concur.