OPINION OF THE COURT
Kenneth K. Rohl, J.
“Marriage is the only actual bondage known to our law. There remain no legal slaves, except the mistress of every house.” (John Stuart Mill, The Subjection of Women [1869].)
The defendant is charged under indictment number 3380/82 with one count of rape in the first degree and a related count of burglary in the first degree.
On June 7,1982 the defendant, John De Stefano, and his wife Judith separated after 14 years of marriage upon his moving out of the marital residence at Browns Road, Lake Ronkonkoma, and renting an apartment at Third Street, Ronkonkoma.
On November 3,1982, the defendant was summoned and appeared before the Family Court to answer charges that he harassed his estranged wife. A temporary order of protection was issued providing in relevant part that:
*114 “1. The Respondent [John De Stefano] shall at all times refrain from any acts of physical violence and/or threats of violence directed towards the Petitioner [Judith De Stefano] and/or any child of the marriage and/or any other member of the family or household.
“2. The Respondent shall remain away from Petitioner and Petitioner’s premises at all times until further order of this Court.”
On November 27,1982, the defendant allegedly in violation of the protective order is charged with having entered the matrimonial residence and, at knifepoint, having forcibly compelled his estranged wife to engage in an act of sexual intercourse with himself. At that time the accused and the victim were legally married and had neither entered into a formal separation agreement nor obtained a decree of judgment of separation or divorce.
Subdivision 1 of section 130.35 of the Penal Law provides that: “[a] male is guilty of rape in the first degree when he engages in sexual intercourse with a female * * * by forcible compulsion”.
In turn, subdivision 4 of section 130.00 defines “female” as:
“ ‘Female’ means any female person who is not married to the actor. For the purposes of this article ‘not married’ means:
“(a) the lack of an existing relationship of husband and wife between the female and the actor which is recognized by law, or
“(b) the existence of the relationship of husband and wife between the actor and the female which is recognized by law at the time the actor commits an offense proscribed by this article by means of forcible compulsion against the female, and the female and actor are living apart at such time pursuant to a valid and effective:
“(i) order issued by a court of competent jurisdiction which by its terms or in its effect requires such living apart, or
“(ii) decree or judgment of separation, or
“(iii) written agreement of separation subscribed by them and acknowledged in the form required to entitle a *115 deed to be recorded which contains provisions specifically indicating that the actor may be guilty of the commission of a crime for engaging in conduct which constitutes an offense proscribed by this article against and without the consent of the female.”
The defendant moves to dismiss the indictment upon the grounds that section 130.00 (subd 4, par [b], cl [i]) violates the due process and equal protection clauses of the State and Federal Constitutions (NY Const, art I, §§ 6, 11; US Const, 14th Arndt).
Specifically, De Stefano contends that subdivision 4 (par [b], cl [i]) is constitutionally infirm since it does not mandate service of the court order upon the husband or require a statement that a husband may not engage in sexual relations with his estranged wife and that a violation thereof may result in his being charged with rape.
In effect, defendant claims that, as written, subdivision 4 (par [b], cl [i]) cannot constitutionally exclude an estranged wife from the definition of “female” since the husband (in an otherwise legal marriage) possesses an absolute common-law and statutory right to engage in sexual intercourse with her and without her consent.
The defendant has thus presented the court with a rare opportunity to examine the viability of the so-called “spousal exemption to rape” and determine whether the existence of such exemption violates the equal protection rights afforded to a specific class of persons, to wit, married women.
In general, the equal protection clause requires that similarly situated individuals .must be accorded evenhanded treatment by the law. (US Const, 14th Arndt; NY Const, art I, § 11.)
In evaluating whether a statute violates the equal protection clause the courts have traditionally and in the absence of either a suspect classification or infringement of a fundamental interest, applied a rational basis test, to wit, the challenged classification will survive if there is some “reasonable basis or relationship” between it and the legislative end. (Alevy v Downstate Med. Center, 39 NY2d 326; Dandridge v Williams, 397 US 471; Plyler v Doe, 457 US 202.)
*116 Where, however, a statute affects a “fundamental interest” such as voting (Harper v Virginia Bd. of Elections, 383 US 663); procreation (Skinner v Oklahoma, 316 US 535); freedom of speech (Carey v Brown, 447 US 455); or criminal appeals (Griffin v Illinois, 351 US 12) or if the challenged classification is “suspect” such as race (Loving v Virginia, 388 US 1); nationality (Hernandez v Texas, 347 US 475); or alienage (Nyquist v Mauclet, 432 US 1) a “strict scrutiny” test is applied, to wit, whether the challenged classification is “necessary to promote a compelling state interest” (Eisenstadt v Baird, 405 US 438).
With respect to gender-based statutes a middle tier test has developed which requires that the classification must be shown to serve “important governmental objectives and must be substantially related to achievement of those objectives” (Craig v Boren, 429 US 190; Wengler v Druggists Mut. Ins. Co., 446 US 142; Reed v Reed, 404 US 71; People v Whidden, 51 NY2d 457). “Although the test for determining the validity of a gender-based classification is straightforward, it must be applied free of fixed notions concerning the roles and abilities of males and females. Care must be taken in ascertaining whether the statutory objective itself reflects archaic and sterotypic notions. Thus, if the statutory objective is to exclude or ‘protect’ members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate.” (Mississippi Univ. for Women v Hogan, 458 US 718, 724-725.)
The party seeking to uphold a gender-based classification bears the burden of showing an “exceedingly persuasive justification” for such (Kirchberg v Feenstra, 450 US 455; Mississippi Univ. for Women v Hogan, supra) and that “there is now a proper relationship between the enactment and its objective rather than whether there necessarily was when it first came into our law” (People v Whidden, supra, at p 463 [dissenting opn, Meyer, J.]; Rundlett v Oliver, 607 F2d 495).
HISTORICAL BACKGROUND
Formal recognition of a spousal exemption or immunity from rape (hereinafter exemption) is attributed to Sir Matthew Hale (1609-1676) who, without citation, wrote: *117 “But the husband cannot be guilty of rape committed by himself upon his lawful wife, for by their mutual matrimonial consent and contract the wife hath given up herself in this kind unto her husband, which she cannot retract.” (1 Hale, Historia Placitorum Coronae [History of the Pleas of the Crown], p 629 [published posthumously, 1736].)
While such a declaration should not have been considered a binding and definitive statement of the common law,* [1] it nevertheless, in 1857, became the judicially recognized basis for the exemption in the United States (Commonwealth v Fogerty, 74 Mass 489 [it would always be competent for a defendant to show a marriage to the victim as a defense to the charge of rape.]).
In State v Haines (51 La Ann 731), the Supreme Court of Louisiana, relying upon Hale’s contractual consent theory to hold that although a husband could not be found guilty as a principal to the rape of his wife, he could be held liable as the aider or abetter of a third person who committed said rape.
In Frazier v State (48 Tex Cr Rep 142), the spouses were living separately in the marital residence after a divorce had been denied to them. No conjugal relationship was being maintained. Thereafter, the husband was convicted of assault with intent to rape. The appellate court overturned this conviction stating (p 143) that “all the authorities hold that a man cannot himself be guilty of actual rape upon his wife.”
Incorporating the exemption into our statutes, section 278 of the New York State Penal Code of 1881 defined rape in terms of a man who had sexual intercourse with a *118 female not his wife. (Cf. People v Connor, 56 Hun 644, 9 NYS 674.) Section 2010 of the Penal Law of 1909 similarly provided that a “person who perpetrates an act of sexual intercourse with a female not his wife * * * [i]s guilty of rape” (emphasis added).
Commenting upon this section the court in People v Meli (193 NYS 365, 366) impliedly followed Hale’s rule stating: “The husband can be guilty of the crime of rape, in so far as his wife is concerned, if he procured the offense to be committed upon her by another, or aided or abetted that other in so doing. If he was the one who with force and against her consent performed the sexual act upon her, there was and could be no rape. This is so, because the husband of a woman cannot himself be guilty of an actual rape upon his wife, on account of the matrimonial consent which she has given, and which she cannot retract.” (Emphasis added.)
In People v Todoro (160 NYS 352, 353), the court summarized the purpose of the rape statutes as: “The act was for the protection of womanhood * * * from the libertine, and while a strict enforcement of its provisions and punishment therefor should receive and does receive the sanction of all well-thinking men and women, there is no provision of the Penal Code in which greater care should be taken by the trial court in protecting the rights of the accused”.
The exemption was subsequently carried forward in subdivision 4 of section 130.00 of the Penal Law of 1965 which defined “female” as: “any female person who is not married to the actor.”
The original Practice Commentary to subdivision 4 is especially enlightening: “The only purpose for this provision is to avoid repetition of a phrase in defining the crimes of sexual misconduct (§130.20) and rape (§§130.25-130.35), i.e., without this drafting device each of these offenses would have to describe the female-victim as one who is not married to the actor. This scheme does not suggest, however, that a husband may not be convicted of rape, as a principal (§ 20.00), when he aids another male in raping his wife. (§ 20.05 [3]) * * * If a woman is in fact legally married to the actor, it is immaterial that they are separated, with or without a judicial decree.” (Hechtman, *119 Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 130.00, p 447; emphasis added.)
Indeed the extensive research done by this court indicates that from Hale until 1977 there was no serious challenge to the spousal exemption (Barry, Spousal Rape: The Uncommon Law, 66 Amer Bar Assn J 1088; Freeman, “But if you can’t rape your wife, who[m] can you rape?” The Marital Rape Exemption Re-examined, 15 Fam L Q 1; see, also, State v Smith, 85 NJ 193; State v Morrison, 85 NJ 212; State v Rideout, 5 Fam L Rptr 2164 [Ore Circuit Ct]).
In 1978, New York amended its statutory definition of “female” to permit the prosecution under certain limited conditions (husband separated from his wife by judicial decree, a written separation agreement limited marital sexual contact or a court order requiring the parties to live apart) of a husband who forcibly perpetrates sexual conduct against his wife that would constitute the crime of rape if the parties were not legally married (Penal Law, § 130.00, subd 4).
The legislative purpose of this amendment was viewed as “a logical extension of the substantive and procedural changes in our sex crimes law of recent years which have recognized and given effect to the rights of women-victims” (Hechtman, 1978 Supplementary Practice Commentary, McKinney’s Cons Laws of NY, Book 39, 1982-1983 Pocket Part, Penal Law, § 130.00, p 289; emphasis added).
Recognizing that New York has evolved to the point that there now exists a less than absolute exemption, the question becomes whether any exemption, no matter how minimal, can exist without violating the equal protection rights of the “unprotected” class, to wit, married women.
THE LAW
The court begins by noting that given the uniqueness of the issues raised, it has reviewed the decisions of sister States as well as other learned treatises to obtain necessary guidance. Moreover, the fact that the issues raise what may ultimately be discerned as moral questions does not preclude judicial resolution. Any “law which embodies social policy inevitably reflects moral judgment to some
*120 degree”. (Matter of Eichner [Fox], 73 AD2d 431, 453, mod on other grounds 52 NY2d 363.)
Universally, rape is perceived as a truly violent and reprehensible crime. Even when accomplished behind the veil of a marriage license, it is a crime of violence not only damaging to the body, but scarring upon the mind. It is a harm different from that in other violent crimes and results in revolting aftereffects. (See Spousal Exemption to Rape, 65 Marq L Rev 120.)
Indeed, it has been written that: “Rape is an abomination not because it is an assault on innocence, but because it is an assault on freedom. The gravity of rape is not in the injury to the hymen or the vagina, it is in the injury to autonomy, to self-esteem. The physical batterings which accompany the rape are not the rape. They are injuries added to insult, battle scars which may be borne triumphantly because they are proof of the insult.” (Toner, The Facts of Rape, p 198.)
From Hale’s first proclamation to the present the exemption has propagated “Hydra-like” arguments to sustain its continued existence (see Schwartz, The Spousal Exemption for Criminal Rape Prosecution, 7 Vt L Rev 32; Abolishing The Marital Exemption For Rape: A Statutory Proposal, 1983 U Ill L Rev 201; The Marital Rape Exemption, 52 NY U L Rev 306; Clancy, Equal Protection Considerations of the Spousal Sexual Assault Exclusion, 16 N Eng L Rev 1; Hilf, Marital Privacy and Spousal Rape, 16 N Eng L Rev 31).
The first argument for the exemption is based upon the ancient belief that a woman was the property of either her father or her husband. The law’s then major concern was to protect a father’s interest in having a virgin present at the time of marriage in order to safeguard succession rights to landed property. It then followed logically that a husband was no more capable of raping his wife than an owner was of stealing his own property (see Schwartz, 7 Vt L Rev, at p 36; State v Smith, supra). Of course, the theory has no validity in this country and nowhere in modern society is a woman regarded as chattel (Trammel v United States, 445 US 40; accord Richard v Richard, 131 Vt 98).
*121 A second argument is that after marriage a wife merged into the person of her husband, no longer retaining a separate legal existence, and thus he could not be convicted, in effect, of raping himself (Blackstone, Commentaries on the Laws of England [1965]). However, the passage of the so-called “Married Women’s Property Act” (1848) established a woman’s separate legal entity and her right to contract and acquire and dispose of property (see Domestic Relations Law, § 50 et seq.). Indeed, in Trammel v United States {supra, at p 52), the court wrote that “[c]hip by chip, over the years those archaic notions have been cast aside so that ‘[n]o longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas.” (See, also, State v Smith, 401 So 2d 1126 [Fla].)
The third, and most common rationale relied upon to support the exemption is based upon a theory of implied consent, to wit, that upon marriage, the wife irrevocably consents to her husband exercising his “marital right of intercourse” (Rex v Clarke, 2 All E R [1949] 448) whenever he so desires (People v Meli, supra; People v Damen, 28 Ill 2d 464).
In Miller v Miller (132 Misc 121, 122), the court described the sexual impact of the marriage contract saying: “Marital intercourse, so that children may be born, is an obligation of the marriage contract, and ‘is the foundation upon which must rest the perpetuation of society and civilization.’ ”
Marriage is the cornerstone of the family. It is a recognized fundamental right and a relationship favored in the law (see Zablocki v Redhail, 434 US 374). It is also more — much more. “[It] is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.” (Griswold v Connecticut, 381 US 479, 486; emphasis added.)
Inherent to the marriage contract are related questions with respect to individual autonomy, procreation, and bodily integrity.
*122 In Eisenstadt v Baird (405 US 438, 453, supra), the United States Supreme Court, holding that a statute restricting the distribution of contraceptives based upon marital status violated the equal protection clause, wrote: “Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of .privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.” (Emphasis in original.)
In Planned Parenthood of Mo. v Danforth (428 US 52), the United States Supreme Court held that a woman, without the consent of and even over the objection of her husband, could procure an abortion. In so concluding, the court stated (p 71): “It seems manifest that, ideally, the decision to terminate a pregnancy should be one concurred in by both the wife and her husband. No marriage may be viewed as harmonious or successful if the marriage partners are fundamentally divided on so important and vital an issue. But it is difficult to believe that the goal of fostering mutuality and trust in a marriage, and of strengthening the marital relationship and the marriage institution, will be achieved by giving the husband a veto power exercisable for any reason whatsoever or for no reason at all. Even if the State had the ability to delegate to the husband a power it itself could not exercise, it is not at all likely that such action would further, as the District Court majority phrased it, the ‘interest of the state in protecting the mutuality of decisions vital to the marriage relationship.’” (Emphasis added.)
In addition, State courts have held that a wife possesses a unilateral right to have a hysterectomy (Murray v Vandevander, 522 P2d 302 [Okla]); a sterilization operation (Ponter v Ponter, 135 NJ Super 50) or to practice birth control (Zagarow v Zagarow, 105 Misc 2d 1054).
In Zagarow (supra, p 1059), the court stated:
“It follows naturally that if a woman can terminate a pregnancy without the consent of her husband, she should *123 be allowed to make the unilateral determination to prevent it.
“It would be futile to rule that a woman must submit to a pregnancy and then hold that she may legally abort it.” (Emphasis added.)
The logical extension of these holdings is that if a wife may unilaterally prevent or terminate a pregnancy does she not also unilaterally possess a right to refuse the physical act which leads to such pregnancy. While recognizing the sanctity of marriage modern decisional law also recognizes that the right of a wife to supremacy over her own body is paramount to her spouse’s desire. Indeed her rights to individual autonomy and to control procreation are but a part of the more comprehensive right to bodily integrity. (Clancy, 16 N Eng L Rev, at p 20.)
Perhaps the clearest acknowledgment of the individual’s right to bodily integrity was enunciated in the “right to die” cases where the issue was whether the State had a sufficiently compelling interest to require the prolonging of life by extraordinary and artificial means.
In Matter of Eichner (Fox) (73 AD2d 431, mod on other grounds 52 NY2d 363, supra), the court held that a competent, terminally ill patient had a right to refuse extraordinary medical treatment and in effect had a right to die. In so concluding, the court stated (pp 454-455): “There exists a solid line of case authority recognizing the undeniable right of a terminally ill but competent individual to refuse care, even if it will inexorably result in his death. The underlying motive for the patient’s decision is irrelevant. Its legal underpinnings have been carefully considered and variously described. The Court of Appeals has affirmed that ‘[e]very human being of adult years and sound mind has a right to determine what shall be done with his body’ (Schloendorff v Society of New York Hosp., 211 NY 125, 129 [Cardozo, J.]). Similarly, it has been stated that: fit is the individual who is the subject of a medical decision who has the final say and that this must necessarily be so in a system of government which gives the greatest possible protection to the individual in the furtherance of his own desires’ (Matter of Erickson v Dilgard, 44 Misc 2d 27, 28 [Meyer, J.]).” (Emphasis added.)
*124 Finally, the implied consent rationale, besides being offensive to the right to control over one’s own body is illogical where the marriage itself is not irrevocable. Indeed, our divorce laws permit a marriage to be terminated upon proof of cruel and inhuman treatment or upon constructive sexual abandonment in excess of one year. (Domestic Relations Law, § 170, subd [1], and cases reported thereunder.)[2]
It may also be argued that to give viability to an implied consent rule establishes a situation that a husband who commits a simple assault and battery upon his wife may insulate himself from criminal liability for such by committing the even more heinous crime of rape and then hiding behind the exemption. “Even if the consent rationale was justified when first articulated, it is entirely inconsistent with today’s concept of egalitarian sexual relationships. Consent should be given by husband and wife for each sexual act, for if women are to be equal marital partners sexual intercourse must be mutually desired and not viewed as a wifely ‘duty’ enforcible by threats of bodily harm and economic sanctions.” (The Marital Rape Exemption, 52 NY U L Rev 306, 313.)
For our Penal Law to permit any type of exemption amounts to the State impermissibly interfering in the marital relationship by granting to a husband a right to control his wife’s bodily integrity.
Indeed, the insight of Mr. Justice Oliver Wendell Holmes is as appropriate today as it was in 1897 when he wrote: “It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.” (Holmes, The Path of the Law, 10 Har L Rev 457, 469.)
The equality principals of modern marital relations have relegated the implied contract theory to the history books — it has no place in the world of the living.
*125 A fourth reason advanced for the exemption is evidentiary problems associated with proving marital rape and the related problem of fabricated complaints.
Those who would favor the evidentiary argument point to State v Rideout (5 Fam L Rptr [BNA] 2164) where a husband, after trial, was acquitted of raping his wife. Upon its conclusion, Charles Burt, the defense attorney commented that the verdict “‘points out the absurdity of bringing the crime of rape as a law into marriage. It’s a waste of the criminal courts’ time to get into that area.’ ” (As quoted in 66 Amer Bar Assn J 1088, 1090.)
On the other hand, lack of consent has always been the most difficult of elements to prove in any rape prosecution. Yet that mere difficulty has not prevented the prosecution of nonmarital cases.
In California, which currently permits the prosecution of husbands for rape, at least three husbands were found guilty after trial (Schwartz, 7 Vt L Rev 33, 49).
With regard to the alleged problem of fabricated complaints, there is no evidence to suggest that this either will or will not occur. However, it is clear that in light of the social stigma associated with rape most women, even wives, would not wish to be publicly identified as a rape victim. “The one thing that has not happened, and which I stressed in my testimony to (the California) Senate Judiciary Committee, is that embittered and vengeful wives are not rushing to their District Attorney to falsely claim rape in order to gain leverage on their husbands in a divorce. Victims are very reluctant to report the crime.” (Letter from Peter F. Sandrock, Jr., District Attorney, Benton County, Ore, to The Women’s History Research Center, Berkeley, Cal [July 7, 1980].)
False reports of rape as well as various other crimes are received daily in the criminal justice system. Yet we do not strike laws from the books or fail to prosecute merely because a false complaint is possible. “Only in marital rape do we remove an entire class of potential victims from the protection of the law in order to protect some abstract possibility of a false claim that the criminal justice system is unable to deal with appropriately.” (Schwartz, 7 Vt L Rev, at pp 53-54.)
*126 Another argument in support of spousal immunity is that extramarital rape prosecutions would preclude the possibility of reconciliation. Not only is this claim ludicrous, but it hardly appears to be an expected or likely consequence of a relationship that has deteriorated to the point of forcible and unwanted sexual contact. (1983 U Ill L Rev 201, 211.)
A final argument is that the wife can resort to other remedies, most notably the obtaining of divorce or a court order of protection.
The obvious answer to the validity of this claim is found within the four corners of the instant case where in alleged violation of a court order the defendant is charged with having raped his “legal” wife at knifepoint.
Clearly no argument can be raised in today’s society to justify a husband’s being exempted from raping his wife. She has a right to the protection the law provides for nonspouses and has been denied the equal protection of law by the existence of the immunity. No governmental interest can be served by its continued existence and it bears no reasonable relation to the class it should protect.
Rape is not merely a crime of sex, but is one of the most violent in nature. The court cannot permit an anachronism in the law to become an indefensible obstruction to human rights.
The antediluvian assumptions concerning the role and status of women in marriage and in society which animated and gave support to the common-law and statutory rules of interspousal immunity have become inconsistent with evolving societal realities. (Nogueria v Nogueria, 388 Mass 79.)
One hundred years later we have come full circle to recognize the stark reality of John Stuart Mill’s characterization of marital rape, to wit: “A female slave has (in Christian countries) an admitted right * * * to refuse her master the last familiarity. Not so the wife * * * he can claim her and enforce the lowest degradation of a human being, that of being made the instrument of an animal function contrary to her inclination.” (John Stuart Mill, The Subjection of Women [1869].)
*127 “There is nothing more domestic and nothing more violent than marital rape.” (Schwartz, 7 Vt L Rev, at p 33 [quoting Laura X, National Clearinghouse on Marital Rape].)
No rule or statute granting a spouse immunity can in today’s world withstand any of the tests associated with equal protection, to wit, “reasonable basis”, “middle tier” or “strict scrutiny.”
Accordingly, I hold that to the extent subdivision 4 of section 130.00 of the Penal Law grants a husband immunity from prosecution for the rape of his lawful wife the same is hereby declared violative of the equal protection clauses of the State and Federal Constitutions.[3]
Having determined that a husband does not possess any right to any immunity from raping his wife, the court will now address the particular facts of the case at bar.
The court first notes that the papers submitted indicate, and defendant does not contest that he was present in the Family Court on November 3, 1982, when the order of protection was granted to his wife.
The defendant’s first claim that his due process rights were violated since the statute did not mandate notice is without merit. Defendant had actual notice of the protective order. “[0]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations which its application might be unconstitutional.” (United States v Raines, 362 US 17, 21.)
*128 With respect to defendant’s further claim that section 130.00 (subd 4, par [b], cl [i]) cannot be used to exclude his estranged wife from the definition of female, the court does not agree.
The order of protection by mandating that defendant remain away from his wife’s premises at all times and remain away from petitioner’s person and further refrain from any acts or threats of physical violence was sufficient to apprise defendant that he could be charged with the crime of rape if he thereafter engaged in sexual intercourse with his estranged wife without her consent. (See People v Liberta, 90 AD2d 681.)
Moreover, the holding of this court that a husband does not possess a right to unconsented sexual relations with his wife further militates against defendant’s argument. He cannot claim that subdivision 4 (par [b], cl [i]) must specifically require a protective order to state that he may not engage in unconsented sexual intercourse with his wife since he possesses no right in any event.
In the instant case the defendant knew at the time he is alleged to have committed the acts that he would face a charge of rape if he interfered with his wife’s bodily integrity.
I have inspected the Grand Jury minutes and find them legally sufficient to sustain the charges contained in indictment number 3380/82.
I have also inspected the Grand Jury minutes with respect to indictment number 690/83 and also find them legally sufficient to sustain the charge contained in that indictment.

. In Queen v Clarence (22 QBD 23 [the first English case to explicitly adapt Hale’s contractual consent theory]) a wife who had contracted gonorrhea from her husband charged him with sexual assault upon the grounds that had she known of his affliction, she would not have consented to intercourse. A majority of 7 of 11 Judges sitting en banc held that the husband could not be convicted of inflicting grievous bodily harm since the forcing of one’s wife to have intercourse without her consent is not unlawful. However, one dissenting Justice wrote: “The authority of Hale, C.J., on such a matter is undoubtedly as high as any can be, but no other authority is cited by him for this proposition, and I should hesitate before I adopted it. There may, I think, be many cases in which a wife may lawfully refuse intercourse, and in which, if the husband imposed it by violence, he might be held guilty of a crime.” (Supra, at p 57 [Field, J.].) Another Justice in the majority seemed to agree: “unless, indeed, as between married persons rape is impossible, a proposition to which I certainly am not prepared to assent, and for which there seems to me to be no sufficient authority.” (Supra, at p 33 [Wills, J.].)

. The court has not discovered any reported case in this State which permits divorce based upon a complaint of unwanted sexual excess. (But see Diehl v Diehl, 188 Pa Super Ct 491, 495 “[s]exual excess, although not endangering life, if it renders the condition of the spouse intolerable and life burdensome, constitutes indignities to the person”.)

. During the course of this court’s extensive research it has discovered at least 38 States have enacted gender-neutral rape statutes. The Legislature is urged to consider its minority position with respect to this issue. (See Alaska Stat, § 11.15.120; Ariz Rev Stat Ann, §§ 13-1404, 13-1405; Ark Stat Ann, §§ 41-1803, 41-1804, 41-1806; Col Rev Stat, § 18-3-403; Conn Gen Stat Ann, § 53a-71; Fla Stat Ann, §§ 794.05, 794.011; Ga Code Ann, §§ 26-2018 — 26-2020; Hawaii Rev Stat, § 707-731; 111 Ann Stat, ch 38, §§ 11-5,11-6; Ind Stat Ann, § 35-42-4-3; Iowa Code Ann, §§ 709.1, 709.3, 709.4; Kan Stat Ann, § 21-3503; Ky Rev Stat Ann, §§ 5Í0.040-510.060; La Rev Stat, § 14.42; Me Rev Stat Ann, tit 17A, §§ 252-254; Md Code Ann, art 27, §§ 463, 464A, 464C; Mass Gen L Ann, ch 265, § 23; Mich Comp L Ann, § 750.520; Minn Stat Ann, §§ 609.342, 609.345; Mo Rev Stat, §§ 566.030, 566.040; Mont Code Ann, §§ 45-5-501 — 45-5-503; Neb Rev Stat, § 28-319; Nev Rev Stat, § 200.364 (subd 3); §§ 200.368, 201.230; NH Rev Stat Ann, §§ 632-A:3, 632-A:4, NJ Stat Ann, § 2C:14-2; NM Stat Ann, §§ 30-9-11, 30-9-13; NC Gen Stat, §§ 14-27.2, 14-27.4; ND Century Code, §§ 12.1-20-03, 12.1-20-05, 12.1-20-07; Ohio Rev Code Ann, § 2907.04; Pa Cons Stat Ann, tit 18, §3122; RI Gen L, §§ 11-37-2,11-37-4,11-37-6; SC Code, § 16-3-655 et seq.; SD Codified L Ann, § 22-22-1; Utah Code Ann, § 76-5-401; Vt Stat Ann, tit 13, § 3252; Wash Rev Code Ann, §§ 9A.44.070-9A.44.090; Wis Stat Ann, § 940.225; Wyo Stat Ann, §§ 6-4-303, 6-4-305.)