### Richmond

RONALD E. WEISHAUPT

V.

COMMONWEALTH OF VIRGINIA

Record No. 830616.

April 27, 1984

Present: All the Justices.

390

*Myron J. Teluk* for appellant.
*Jacqueline G. Epps, Senior Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal raises an issue of first impression in the Commonwealth: whether a husband can be guilty of raping his wife, in violation of Code § 18.2-61, where, at the time of the alleged offense, the parties were living separate and apart.

Weishaupt was indicted for rape. He moved to dismiss the indictment on the ground that pursuant to common law principles, a husband cannot be convicted of raping his wife. The trial court rejected Weishaupt's argument and denied the motion. The case was tried to a jury which found Weishaupt guilty of attempted rape. Judgment was entered on the verdict and Weishaupt was sentenced to two years in prison. Execution of that sentence was suspended, pending the outcome of this appeal.

On appeal, Weishaupt contends that the trial court erred in failing to dismiss the indictment. We believe the trial court was correct in its ruling. Therefore, we will affirm the conviction.

Viewing the evidence in the light most favorable to the Commonwealth, we find the facts to be as follows: Janet and Ronald Weishaupt were married on July 19, 1980. One child was born of their marriage. On November 9, 1981, Janet moved out of the marital abode, taking with her the couple's infant child. From the time Janet moved out in November 1981, through the date of the attack in October 1982, the parties lived separate and apart and did not engage in any sexual relations. Their contacts were limited to telephone conversations about their child and chance meetings in public where they exchanged perfunctory greetings. During the eleven months prior to the attack, Janet consulted a lawyer regarding a divorce and was advised to wait until she had been separated for one year, before filing any divorce papers.

On the night of October 16, 1982, Weishaupt saw his estranged wife at a bowling alley. She was part of a group consisting of

three males and three females. Janet said a "simple hello" to Weishaupt, "just to be friendly." Janet's group bowled until approximately 12:30 a.m. on October 17, 1982. Her group then made plans to leave the bowling alley and meet at the apartment of one of the other women. However, two of the couples wanted to go "four-wheel-driving" before continuing their evening. Janet and one of the men chose not to go driving. They decided to wait in the apartment until the others arrived.

Weishaupt, who left the bowling alley shortly after his estranged wife's group, was driving around when he encountered a vehicle containing the two couples whom he had seen bowling with Janet and her companion. Weishaupt flagged the car down, observed that Janet and one of the three men were no longer in the group, and demanded to know where she was. When no one responded, Weishaupt drove off in search of his wife. He went to the highrise apartment building where Janet and her escort were waiting for the others. He proceeded to the sixth floor of the building and beat on the door to the apartment where he suspected Janet was located. Janet looked through the peephole and recognized Weishaupt but neither opened the door nor acknowledged that she was inside. For a while, Weishaupt continued to beat on the door and try the doorknob, but eventually he stopped. Janet peeped through a window and saw him getting into his car. She thought he had left.

A short time later, however, Weishaupt returned to the apartment building. This time, instead of going inside he climbed up the outside of the building, working his way vertically from balcony to balcony until he reached the balcony to the apartment where Janet was located. He pounded on the sliding glass door. Janet came to investigate the noise, recognized Weishaupt, and told her companion that Weishaupt was on the balcony. At the suggestion of her companion, Janet opened the balcony door.

As soon as the door was opened, Weishaupt charged into the apartment, ran into the bedroom and leaped on top of Janet's companion, punching him and yelling that he had "caught" them. Weishaupt demanded that the other man "step outside." Janet ran to the kitchen to call the police but Weishaupt pursued her, ripped the phone from her hand, tore the cord from the phone, and shoved her away. He then continued his altercation with the other man. Janet tried to break up the fight by stepping between the men. This time, Weishaupt knocked her down.

Weishaupt continued to demand that the other man step outside. The other man finally agreed, but said he would step outside only to talk, not to fight. Weishaupt held the door open, the other man walked out first, whereupon Weishaupt slammed the door, leaving him in the apartment alone with Janet.

Standing on the other side of the door, Janet's companion could hear her inside screaming and telling Weishaupt to leave her alone. He tried to gain entry by knocking on the door and asking Weishaupt to let him in. He got no response. While he was standing outside the door a security guard walked up to investigate the ruckus.

In the apartment, Weishaupt turned his attention to Janet. He pushed, shoved, and dragged her into the bedroom. Though she resisted, he succeeded in forcing her into the room, then threw her on the bed. All the while she was screaming, "no, don't. I don't want to." She fought with him on the bed and they fell to the floor. Weishaupt landed on top. He pinned Janet's arms down with his knees then used his hands to choke her as he demanded to know whether she had been to bed with anyone. She said no. She pleaded with him to let her get a drink of water. Weishaupt released her momentarily. When she finished getting the water, he put her back on the bed and started to kiss her and undo her blouse. She fought with him again and again they fell to the floor. This time he got her pants down and in Janet's words, "proceeded to have intercourse." With Janet on the floor beneath him, Weishaupt stated, "I have to do this to find out if you've been to bed with anyone else."

Throughout his ordeal, Janet continued to scream and resist. When the apartment owner arrived to open the door for the security guard, she and others in the hallway could hear Janet's screams. The security guard heard Janet say "leave [me] alone, you're hurting me, get off of me." When the door was opened, Janet was found lying on the floor, at the foot of the bed, curled up in the fetal position with her pants and underpants down to her ankles. She had red marks on her back and was sobbing hysterically.

Weishaupt was standing nearby covered with perspiration. He was observed buckling up his pants. One of the women who came to Janet's assistance asked Weishaupt whether he had raped Janet. He replied, "yes, I tried."

Weishaupt admits that he and Janet were living separate and apart at the time of the attack. Nevertheless, he contends that he had an absolute right to do what he did. In making this argument he relies on the so-called "marital exemption" which he says developed in English common law and applies in Virginia because of Code § 1-10.[1] The source of the marital exemption is said to be a statement made by the 17th century English jurist Sir Matthew Hale.[2] He wrote as follows:

> [T]he husband cannot be guilty of a rape committed by himself upon his lawful wife, for by their mutual matrimonial consent and contract the wife hath given up herself in this kind unto her husband, which she cannot retract.

1 M. Hale, *The History of the Pleas of the Crown* (1736) at 629. Weishaupt argues that Hale's rule is absolute and completely exonerates his conduct.

Weishaupt advances three arguments in support of his position. He contends first that Code § 18.2-61[3] does not alter the common law rule as stated by Hale because the statute does not state explicitly that the common law rule is no longer in effect. Second, he argues that Hale's rule was adopted in Virginia in cases which used the word "unlawful" in defining rape. Third, he argues that to permit a husband to be charged with raping his wife would be

---

[1] Code § 1-10 reads as follows:
The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this State, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly.

[2] Hale was born in 1609, two years after the landing at Jamestown. He became Lord Chief Justice of the Court of King's Bench in 1671, a position which he held until he resigned in 1675. He died in 1676. It is not certain when he wrote his now famous statement, but the book based on his manuscript was not published until 1736, 50 years after his death. At the time Hale wrote, marriage was irrevocable and women were deemed the property of their husbands. *See The Marital Rape Exemption*, 52 N.Y.U. L. Rev. 306 (1977). Thus, his statement may have been a reflection of a view of the world that existed before America was born.

[3] Code § 18.2-61 reads in pertinent part as follows:
If any person has sexual intercourse with a female or causes a female to engage in sexual intercourse with any person and such act is accomplished (i) against her will, by force, threat or intimidation, or (ii) through the use of the female's mental incapacity or physical helplessness, . . . he or she shall, in the discretion of the court or jury, be punished with confinement in the penitentiary for life or for any term not less than five years.

disruptive to marriages. In our opinion, all of Weishaupt's arguments are meritless. We will address the arguments seriatim.

Weishaupt's first argument relies upon an unstated assumption. His reasoning runs as follows: (1) Code § 1-10 causes the common law of England to apply in Virginia; (2) since Code § 18.2-61 does not state that it modifies the common law rule, that rule remains in effect; and (3) therefore, Weishaupt concludes, he cannot be convicted of raping his wife. The unstated assumption is that Hale's statement sets forth the common law of England. That assumption is mistaken.

Hale's statement was not law, common or otherwise. At best it was Hale's pronouncement of what he observed to be a custom in 17th century England. Yet, unlike other customs which form the bases of common law, it nowhere appears that Hale, in making his statement, set forth a general rule of conduct of such longstanding acceptability that "the memory of man runneth not to the contrary." *See* I W. Blackstone, *Commentaries on the Laws of England* (1765) at 67. Moreover, Hale cites no authority for his view nor was it subsequently adopted, in its entirety, by the English courts.

According to Blackstone, "the judges in the several courts of justice" were to determine the existence and validity of customs or maxims that were claimed to be part of the common law. *Id.* at 69. Blackstone went on to state that "judicial decisions are the principal and most authoritative evidence, that can be given, of the existence of such a custom as shall form a part of the common law." *Id.* The Supreme Court of the United States has also stated that common law is a product of courts disposing of cases. In *Kansas* v. *Colorado*, 206 U.S. 46, 97 (1906), the Supreme Court wrote that, "the common law is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals in respect to private disputes." *See also* 15A Am. Jur. 2d *Common Law* § 1 (1976). Clearly then, Hale's statement, standing alone, does not and cannot qualify as common law. Thus, Weishaupt's reliance upon it is misplaced and his assumption that it states a rule of law applicable in Virginia is wrong.

Our analysis establishes that only a portion of Hale's statement was ever accepted in England. *Rex* v. *Lister*, 1 Strange 477, 93 Eng. Rep. 645 (1721), was written after Hale died but before his book was published. It is not a rape case and it does not directly

address the issue of marital exemption from rape. It is nonetheless important because it concerns a husband's power over a woman from whom he was separated. The defendant and his wife were living separate and apart pursuant to a "deed of separation," which turned over some of the wife's property to her husband and retained an amount for her separate maintenance. The defendant, who wanted more money from his estranged wife, seized her and took her to a remote place where he kept her under guard. The woman's family "brought a habeas corpus." The Chief Justice ruled that where the parties had separated by consent and the wife had not made undue use of her liberty, the husband had no right to deprive her of her liberty. In *State* v. *Smith*, 85 N.J. 193, 426 A.2d 38 (1981), in which the New Jersey Supreme Court ruled that a husband could be found guilty of raping his wife, that court stated that the import of *Lister* is that if a wife had a right to live separately from her husband then "it follows that she also had a right to refuse sexual intercourse with him at least while they were separated." 85 N.J. at 202, 426 A.2d at 42-43.

The first recorded English opinion to discuss Hale's statement directly is *R.* v. *Clarence*, [1888] 22 Q.B.D. 23. However, that also was not a rape case and the court was not required to rule on the validity of the statement. The issue in *Clarence* was whether a husband could be convicted of unlawfully and maliciously inflicting grievous bodily harm upon his wife where he had intercourse with her while he knew, but she did not know, that he was suffering from gonorrhea, which disease subsequently infected the wife, and where the wife testified that had she known of her husband's condition she would not have submitted to the intercourse. At trial, the defendant was found guilty. On appeal, the conviction was quashed. Thirteen justices voted on the case. Nine voted to quash the conviction.

In resolving the case, one justice wrote he was not prepared to accept the proposition that it was impossible for a husband to rape his wife. He described Hale's statement as, "a proposition to which I certainly am not prepared to assent, and for which there seems to me to be no sufficient authority." 22 Q.B.D. at 33 (Wills, J.). Another posed a question which implicitly acknowledged that a wife could revoke her consent to marital sex. He wrote as follows: "Until the consent given at marriage be revoked, how can it be said that the husband in exercising his marital right has as-

saulted his wife?" 22 Q.B.D. at 37 (Smith, J.). Yet another flatly stated that he questioned Hale's authority:

> The authority of Hale, C.J., on such a matter is undoubtedly as high as any can be, but no other authority is cited by him for this proposition, and I should hesitate before I adopted it. *There may, I think, be many cases in which a wife may lawfully refuse intercourse, and in which, if the husband imposed it by violence, he might be held guilty of a crime.*

22 Q.B.D. at 57 (Field, J.) (dissenting opinion). The several views expressed by the justices make unmistakably clear that after *Clarence*, Hale's statement still had not been made part of English common law.

It was not until 1949 that an English Court was finally required to decide whether a husband could be found guilty of raping his wife. The case was *R. v. Clarke*, [1949] 2 All E.R. 448. There, the husband and wife were living separate and apart. Prior to the alleged rape, the wife secured a court order which recited that she was no longer bound to cohabitate with her husband. While that order was in effect, the husband had intercourse with his wife by force, without her consent. The Court recited Hale's statement, then ruled that, "As a general proposition it can be stated that a husband cannot be guilty of a rape on his wife." *Id.* The Court thus adopted Hale's implied consent theory. However, on the facts of the case it held that because of the order of separation, the wife's consent to sexual intercourse had been revoked by "process of law." The husband's motion to quash his indictment was denied. *Id.* at 449.

*Clarke* was followed in *R. v. Miller*, [1954] 2 All E.R. 529, where the husband attacked his wife after they had lived separate and apart for more than one year and after the wife had filed for divorce. The Court found that at the time of the attack no order of separation had been entered by a court nor had the parties executed a separation agreement between themselves. Based on those facts, the court said that there was no "evidence" which enabled it "to say that the wife's implied consent to marital intercourse [had] been revoked by an act of the parties of by an act of the courts." *Id.* at 533.

Both *Clarke* and *Miller* were adhered to in *R. v. O'Brien*, [1974] 3 All E.R. 663. There, at the time of the alleged rape the couple had not been granted a final divorce. But a "decree nisi" had been granted. The court ruled that the entry of that decree revoked the "wife's implied consent to marital intercourse." *Id.* at 665. The husband had moved to quash the rape indictment; his motion was denied.

It is apparent from the English cases that, contrary to Weishaupt's assumptions and representations, from earliest times, a wife who was separated from her husband was in a different position than a wife living with her husband. The separation served to cut off marital rights that her husband otherwise may have had. Thus, the true state of English common law was that marriage carried with it the implied consent to sexual intercourse; but that consent could be revoked. The requirement for revocation was that there exist either a court order of separation or one limiting contact, or that there exist a separation agreement entered into by both husband and wife. The English courts refused to accept a unilateral revocation of consent to marital sex by the wife even if that revocation was manifested by the wife's moving out and filing for divorce. Nevertheless, contrary to the position advanced by Weishaupt, under English common law, there never existed an absolute irrevocable marital exemption that would protect a husband from a charge of rape in all circumstances.

The actual English common law rule, if applied directly to the facts of this case, would require us to reverse Weishaupt's conviction. But such a direct application is not possible. Before English common law can be applied in Virginia it must be analyzed in light of Code § 1-10 and the cases interpreting that code section. According to the code, English common law cannot be applied if it is "repugnant to the principles of the Bill of Rights and the Constitution." Nor can it be applied if it is "altered by the General Assembly." In addition to the statutory provision, *Foster* v. *Commonwealth*, 96 Va. 306, 31 S.E. 503 (1898), sets forth yet another limitation on the use of English common law. In *Foster*, we considered the predecessor to Code § 1-10. We stated that though the statute, aside from its express limitations, appears to adopt English common law "generally, and without a qualification," this is not in fact the case. 96 Va. at 309, 31 S.E. at 504. The true rule is this:

Such of [English common law] doctrines and principles as are *repugnant to the nature and character of our political system, or which the different and varied circumstances of our country render inapplicable to us*, are either not in force here, or must be so modified in their application as to adapt them to our condition.

96 Va. at 310, 31 S.E. at 505 (emphasis added). Thus, by statute and case law, we are free, in essence, to adopt from English common law those principles that fit our way of life and to reject those which do not.

We must decide, therefore, whether the English rule, which permits revocation of the implied consent to marital sex but which refuses to grant that power to a woman acting unilaterally, is repugnant to the nature and character of our political system, contrary to statute, or whether the circumstances existing in Virginia render it inapplicable.

■ The question whether a woman should be allowed to make a unilateral decision to withdraw consent to marital sex is bound up in the larger question of whether women are to be in independent control of their personal fates or whether they are to be under the control of others. At the time Hale wrote, this latter view was much in vogue. At that time, a woman was considered "the property of either her father or her husband." *The Marital Rape Exemption*, 52 N.Y.U.L. Rev. 306, 309 (1977). When a woman married in the 17th century her very legal existence was deemed "suspended during the marriage, or at least . . . incorporated and consolidated into that of the husband, under whose wing, protection, and cover" she functioned. *Id.* at 310. No citation to authority is required to establish that these views of the dependence of women have long been cast aside.

Recent cases from this Court have underscored the ever-increasing separateness and independence accorded women in this Commonwealth. In *Stewart* v. *Commonwealth*, 219 Va. 887, 252 S.E.2d 329 (1979), we rejected the argument that the legal fiction of unity between husband and wife was a defense to a charge of grand larceny against the husband, for stealing his wife's property. That decision was based on the Married Woman's Act, Code §§ 55-35 through -47.1. In *Stewart*, we listed other decisions in which we relied on the Act to strike down principles that essentially limited a wife's independence and separateness from her

husband. *Edmonds* v. *Edmonds*, 139 Va. 652, 124 S.E. 415 (1924); *Vigilant Ins. Co.* v. *Bennett*, 197 Va. 216, 89 S.E.2d 69 (1955); *Surratt, Adm'r.* v. *Thompson*, 212 Va. 191, 183 S.E.2d 200 (1971); and *Korman* v. *Carpenter*, 216 Va. 86, 216 S.E.2d 195 (1975). Much more recently, we declared the necessaries doctrine unconstitutional, *Schilling* v. *Bedford Co. Hospital*, 225 Va. 539, 303 S.E.2d 905 (1983), and rejected the argument that a husband's right of access to his wife gave him the right to break into his wife's separately maintained dwelling with intent to commit assault and battery, *Knox* v. *Commonwealth*, 225 Va. 504, 304 S.E.2d 4 (1983). In *Knox* we wrote as follows:

> [W]hen a wife is living apart from her husband in her own dwelling, one in which he has no proprietary interest, the husband's right of consortium is subordinate to the wife's right of exclusive possession.

225 Va. at 507, 304 S.E.2d at 6. None of these opinions bears directly on the point in issue but they show a trend in the law to give women independent control over their property and financial affairs. They also suggest that if a woman's independent control over her property is protected by law, then her independent control over her physical person should likewise be protected.

■ Also relevant to our inquiry is the action of courts in sister states on the question whether a husband can be found guilty of raping his wife. Courts in New Jersey, Massachusetts, Florida, and New York have ruled, using various rationales, that under appropriate circumstances, described in each case, a husband can be found guilty of raping his wife. *State* v. *Smith*, 85 N.J. 193, 426 A.2d 38 (1981); *State* v. *Morrison*, 85 N.J. 212, 426 A.2d 47 (1981); *Commonwealth* v. *Chretien*, 383 Mass. 123, 417 N.E.2d 1203 (1981); *State* v. *Smith*, 401 So.2d 1126 (Fla. Dist. Ct. App. 1981); and *People* v. *De Stefano*, 121 Misc. 2d 113, 467 N.Y.S.2d 506 (N.Y. Cty. Ct. 1983).

The facts in the New Jersey case of *State* v. *Smith* were quite similar to those in this appeal. At the time of the attack, the couple had been separated for one year. However, no court orders or separation agreements were in effect. The New Jersey court did not attempt to decide whether a marital exemption existed in general. It limited its inquiry to whether any such exemption could cover defendant's conduct. The court said no. It found the implied

consent rationale for the marital exemption offensive to valued ideals of personal liberty and unsound where marriage was revocable. 85 N.J. at 205, 426 A.2d at 44. In *Morrison*, the rape conviction was upheld because the husband in attacking his wife, from whom he was already separated, violated both a temporary restraining order and a separation agreement which he had signed. 85 N.J. at 217, 426 A.2d at 50.

*Chretien* turned on a statutory analysis. There, the court concluded that the Massachusetts legislature had eliminated the marital exemption in that state by eliminating the word "unlawful" from the statutory definition of rape. 383 Mass. at 132, 417 N.E.2d at 1208.

In the Florida case of *State* v. *Smith*, the court ruled that the wife had withdrawn her consent to marital intercourse by filing for divorce and securing a court order limiting contact. However, the court was not content to rest its opinion upon that rationale. It went further and decided, based on statute, that there was no implied consent to "sexual battery," the Florida equivalent to rape. 401 So.2d at 1129.

*De Stefano* was decided on constitutional grounds. There, as here, no court orders or separation agreements were involved. The parties simply separated when the husband moved out. The New York court concluded that the concept of implied consent was offensive to the right to control one's own body and was illogical where marriages could be revoked. The court said to permit any kind of exemption was tantamount to giving "a husband a right to control his wife's bodily integrity." 121 Misc.2d at 124, 467 N.Y.S. 2d at 514. The court then raised an interesting paradox: It suggested that a husband who set out to commit a simple assault and battery might decide to go further and commit the more heinous crime of rape in an effort to hide behind the exemption. Thus, the exemption, it was suggested, would lead to increased violence. *Id.*

The trend in the recent cases which have analyzed problems of spousal rape is in accord with the trend in recent Virginia cases touching upon the property rights of women. Both sets of cases point to an increasingly recognized role of the autonomy and independence of women. Both sets of cases suggest a break with the ancient rules that cast women in a subservient posture.

■ Continuing our analysis under Code § 1-10, we are of the further view that the Virginia no-fault divorce statute, Code § 20-

91(9), embodies a legislative endorsement of a woman's unilateral right to withdraw an implied consent to marital sex. The no-fault statute requires that the parties live separate and apart without cohabitation for a specified time period as a prerequisite to securing a no-fault divorce. The very scheme of the statute contemplates a voluntary withdrawal, by either spouse, from the marital relationship. Stated differently, the statute contemplates a *de facto* termination of the marital relationship which after the passage of time will be terminated *de jure*. If, in this case, we failed to recognize a wife's unilateral authority to withdraw the implied consent to marital sex our decision would be inconsistent with a wife's statutorily acknowledged right to make a *de facto* withdrawal from the marriage contract. Along the same lines, if a woman can unilaterally secure a divorce, thereby revoking the marriage contract in its entirety, then it is illogical to conclude that she cannot, by her own act, revoke a term of that contract.

The cases discussed above taken together with the no-fault divorce statute provide ample bases upon which the Court could modify the English common law rule. However, the Attorney General argues that instead of modifying the rule we should use this case as a vehicle to abolish it. The Attorney General contends, on the basis of Section 1 of the Virginia Bill of Rights,[4] that any concept of implied consent to intercourse growing out of the marital relationship is unconstitutional. The Attorney General submits that blanket consent to sexual intercourse implied from marriage runs counter to the Bill of Rights in that it impinges upon individual liberty. In essence, the Commonwealth urges us to adopt what would amount to a requirement of actual consent on the part of the wife before each act of intercourse. In our opinion, we do not have to reach this argument in order to decide the present case. This is so because the Commonwealth's argument concerns a situation where a husband and wife are living together in a more or less normal, on-going marital relationship. Here, by contrast, we are concerned with a situation where, among other things, a husband and wife have lived separate and apart for almost one year and have not engaged in sexual relations during

---

[4] Section 1 of the Virginia Bill of Rights, Va. Const. Art. I, § 1, reads as follows:
That all men are by nature equally free and independent and have certain rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty and possession of property, and pursuing and obtaining happiness and safety.

that time period. We will base our decision on the facts before us, not on hypothetical facts.

■ Given the trend in our own cases, the results in cases we cited from other courts which have considered the issue of spousal rape, and other relevant considerations heretofore described, pursuant to Code § 1-10 and *Foster*, we hereby reject so much of the English common law rule regarding a husband's marital exemption from a charge of raping his wife and the implied consent to marital intercourse as provides that a wife cannot unilaterally revoke her implied consent to marital intercourse. In light of this conclusion, it is plain that Weishaupt's first argument, i.e., that Code § 18.2-61 does not alter the common law, cannot suffice to overturn his conviction.

■ Weishaupt's second argument is of no more merit than his first. In this argument he contends that though the Virginia rape statute has never used the word "unlawful" in defining rape, certain early cases from this Court used that term in defining rape. Weishaupt says that the use of the word unlawful by the Court means the Court adopted Hale's rule. Weishaupt submits that sex between married persons is lawful. Therefore, he reasons that the use of the word unlawful in defining rape must mean that the Court intended to exclude married couples. The Attorney General responds that whatever the reasons for the use of the word unlawful in early rape cases, that word has not been used, in our cases, since 1956, though this Court has handed down approximately 150 rape cases in that 28-year period. The result is that even if Weishaupt's argument had merit, the basis for his position has not existed for nearly three decades. Thus, by Weishaupt's own logic, if the use of the word unlawful meant acceptance of Hale's rule then the elimination of the word unlawful must have meant the rejection of Hale's rule. Consequently, by that logic, when Weishaupt attacked his wife there existed no marital exemption of any kind.

The Attorney General points out a second problem with Weishaupt's argument concerning the use of the word unlawful. He states that the issue of spousal rape was not present in any of the cases relied on by Weishaupt. Therefore, the Attorney General argues, it cannot be assumed that by the mere insertion of the word unlawful the Court intended to exclude the possibility of spousal rape. We find merit in both the Commonwealth's arguments in response to Weishaupt's second contention.

■ Weishaupt's third argument is that to allow a husband to be convicted of raping his wife will be disruptive to marriages. He contends that the possibility of reconciliation will be foreclosed. This argument is absurd. It is hard to imagine how charging a husband with the violent crime of rape can be more disruptive of a marriage than the violent act itself. Moreover, if the marriage has already deteriorated to the point where intercourse must be commanded at the price of violence we doubt that there is anything left to reconcile.

■ We hold, on the basis of all the foregoing considerations, that a wife can unilaterally revoke her implied consent to marital sex where, as here, she has made manifest her intent to terminate the marital relationship by living separate and apart from her husband; refraining from voluntary sexual intercourse with her husband; and, in light of all the circumstances, conducting herself in a manner that establishes a *de facto* end to the marriage. And, once the implied consent is revoked, even though the parties have not yet obtained a divorce, the husband can be found guilty of raping his wife, if the evidence against him establishes a violation of Code § 18.2-61.

In the instant appeal, the facts establish Janet's intent to terminate the marital relationship. We are convinced that, prior to the attack, she withdrew any implied consent to marital intercourse. Finally, there is no challenge to the sufficiency of the evidence to prove the crime for which Weishaupt was convicted.

Therefore, the judgment in this will be

*Affirmed.*

COMPTON J., Concurring.

I concur in the result. I write separately to express my understanding that the Court's decision specifically is limited to the precise facts of this case in which there was continuous separation by the wife from the husband for a substantial period of time, no sexual intercourse during the period, and additional objective evidence supporting an intention by the wife permanently to separate from the husband.

While we have recognized in our cases the independence of women in this State, this recognition should not operate to discriminate against men. Thus, because there was no divorce suit

pending and no court order enjoining the husband from access to the wife, the precedent established by this case will be difficult to administer. Nevertheless, the flood gates have not been opened for the prosecution of husbands for the alleged rapes of their wives.

Therefore, I understand that the decision today does not apply, for example, to the case of a wife's temporary move to a separate room in the same house, or to the wife's move to a residence separate from the husband when there is regular social contact between the spouses. In short, I infer that the decision today does not validate or furnish any support for prosecution of husbands when there is a cry of "Rape!" by wives who have not demonstrated over a prolonged period of time a clear intention permanently to separate from the husband and such complete separation has, in fact, occurred.

COCHRAN and RUSSELL, JJ., join in concurring opinion.