## Richmond

### EDWARD ALAN KIZER

### V.

### COMMONWEALTH OF VIRGINIA

Record No. 831968.

October 12, 1984.

Present: All the Justices.

*John O. Goss (Goss and Micheli,* on brief), for appellant.
*Jacqueline G. Epps, Senior Assistant Attorney General (Gerald
L. Baliles, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this appeal of a conviction for marital rape, we apply the rule of *Weishaupt* v. *Commonwealth,* 227 Va. 389, 315 S.E.2d 847 (1984), to the facts of this case. In *Weishaupt,* we held that:

> "[A] wife can unilaterally revoke her implied consent to marital sex where . . . she has made manifest her intent to terminate the marital relationship by living separate and apart from her husband; refraining from voluntary sexual intercourse with her husband; and, in light of all the circumstances, conducting herself in a manner that establishes a *de facto* end to the marriage. And, once the implied consent is revoked, even though the parties have not yet obtained a di-

vorce, the husband can be found guilty of raping his wife, if the evidence against him establishes a violation of Code § 18.2-61."

*Id.* at 405, 315 S.E.2d at 855. Applying the foregoing criteria to the circumstances of the present case, we reverse the conviction.

Indicted for the rape of his wife in violation of Code § 18.2-61, Edward Alan Kizer was found guilty in a bench trial and sentenced on September 9, 1983 to confinement in the penitentiary for a term of 20 years. Execution of 15 years of the sentence was suspended and the defendant was placed on probation for life.

Because the proceedings below in this case were completed before *Weishaupt* was decided, the central issue in the trial court was whether Virginia law permitted a prosecution for rape where the accused, at the time of the alleged offense, was married to the victim. Anticipating the result in *Weishaupt,* the trial court properly answered that question in the affirmative. Likewise anticipating our statement in *Weishaupt* that a wife unilaterally can revoke her implied consent to marital intercourse, the defendant, in an alternative argument, urged the trial court to rule that the Commonwealth's evidence was "insufficient to show a separation of the sort which would be contemplated" by the principles we ultimately adopted in *Weishaupt.* Thus, the trial court, in finding the defendant guilty, implicitly ruled the prosecution carried its burden under *Weishaupt* to establish beyond a reasonable doubt a *de facto* end to the parties' marriage. This was error.

The facts mainly are undisputed. Defendant and his wife, Jeri, were married in June of 1981 in Texas. The couple moved to Norfolk where defendant, age 20, was stationed aboard ship as an enlisted man in the Navy. They occupied rented quarters ashore that were leased in both names. Following the birth of a child, the couple began having marital difficulties. In September of 1982, about six months before the incident in question, the wife returned to Texas briefly. According to her testimony, the purpose of the trip was "to visit" her parents for two weeks; the visit was not "a separation" from her husband.

During the "middle of February" 1983, about three weeks before the alleged offense, the defendant "moved back to the ship." The wife continued to reside in the apartment with the child. According to the wife's testimony, the separation occurred because "[t]he marriage was over and I did not want the marriage

to be any longer. . . ." The wife added that she "wanted to be separated and in the process to file for divorce after the legal separation in Virginia." The defendant testified that the parties were not "legally separated" and that he moved to the ship "to avoid any other arguing with my wife . . . in front of our son because we did not want to subject him to arguing between me and my wife, Jeri."

Previously, the wife had left the husband from "about the first of January to about the middle of February" 1983. After the parties "had talked to each other," she returned to the marital home, saying to the husband, "I want to make it work but I do not love you." The defendant had suspected his wife of "fooling around" while he was on duty at sea, but testified that he "still loved the girl" and wanted the marriage "to work."

During the three-week period from the middle of February to the date of the incident, the defendant came to the apartment to visit the child pursuant to an oral agreement with the wife. She estimated he made "a couple" visits. The defendant testified that he "tried" to visit the boy "seven or eight times." The parties had agreed that the defendant would notify the wife in advance of a planned visit so that she would not be in the apartment when he arrived.

On March 5, the day before the incident in question, the defendant came to the apartment without notifying the wife. She refused to allow him to enter the premises during the morning and again during the afternoon. Still later in the day, she permitted him to see the child as the wife, accompanied by a male friend, left the apartment on the friend's motorcycle. She returned to the apartment about five hours later, at 11:30 p.m., but did not remain. The defendant told her he was staying at the marital abode because he did not want to return to the ship due to the lateness of the hour.

The evidence showed that the parties did not engage in sexual intercourse during the period from September 1982, when she visited her parents in Texas, until the date of the incident in question. During a portion of this time, the defendant was aboard ship at sea.

Prior to the alleged offense, the defendant filed a petition in court seeking an award of custody of his child. In addition, the parties decided in February to consult a lawyer "about getting a legal separation." As the parties were en route to an attorney's

office, the wife told defendant that she had changed her mind and that she did not want to separate "right now." He said, "Are you sure?" and she responded, "Yes." They returned to their apartment. The wife testified that she decided to discontinue the trip to the attorney because the defendant had just received notification that his father was very ill and she did not want to put more "pressure" on him at that time.

The evidence showed that before the day of the alleged offense, the defendant discussed "the rape laws of Virginia" with a friend. The defendant had said that "he [the defendant] was kind of hard up for sex" and that he thought he "ought to go over there and rip her clothes off of her and take it."

On the day in question, March 6, the defendant had been visiting friends in an apartment "across the hall" from the marital home. He knocked on the door to his apartment about 6:00 p.m. and asked his wife to allow him to use the shower. She refused because she was afraid to be in the premises alone with him. The defendant insisted on gaining entry and, as the wife tried to lock the front door to the apartment, he kicked the door twice. The door "came open and the frame came off the door," according to the wife's testimony. The defendant took the child from the mother's arms and placed him on the floor. The defendant picked up the wife, carried her to the bedroom, ripped off her clothing, and forcibly had sexual intercourse with her. During this time, she was screaming, scratching, kicking, and pulling defendant's hair. At one point during the 45-minute episode, the wife broke away from the defendant and rushed to the bedroom window, screaming for help. After the assault, the wife ran from the apartment and reported the incident to a police officer who was in the area.

The defendant was arrested on a warrant that day about 9:45 p.m., after earlier having confessed to the acts essentially as related by the wife. About three weeks after the incident, and before the rape trial, the defendant was awarded custody of his son following a hearing.

 On appeal, the question presented is whether, under this evidence, the Commonwealth established beyond a reasonable doubt the elements necessary to sustain a conviction for marital rape. In such a case, under *Weishaupt,* the prosecution, in addition to establishing a violation of the general rape statute, Code § 18.2-61, must prove beyond a reasonable doubt that the wife unilaterally had revoked her implied consent to marital intercourse.

227 Va. at 405, 315 S.E.2d at 855. The wife's revocation of consent must be demonstrated by a manifest intent "to terminate the marital relationship." *Id.,* 315 S.E.2d at 855. The facts necessary to show this intention to terminate must reveal that the wife: has lived separate and apart from the husband; has refrained from voluntary sexual intercourse with her husband; and, "in light of all the circumstances," has conducted herself "in a manner that establishes a *de facto* end to the marriage." *Id.,* 315 S.E.2d at 855. In this context, *"de facto"* means "in fact," or "actually." Black's Law Dictionary 375 (5th ed. 1979).

In the present case, the evidence shows, first, a violation of the rape statute sufficient to sustain a conviction of the defendant for the rape of a female not his wife. Second, the evidence establishes that the parties lived separate and apart. Third, the proof shows that the wife refrained from voluntary sexual intercourse with the defendant. The evidence fails, however, to show beyond a reasonable doubt the wife conducted herself in a manner that established an actual end to the marriage, in light of all the circumstances.

Significantly, the wife's marital conduct during the six-month period before the assault was equivocal, ambivalent, and ambiguous. Prior to September 1982, the parties had been having domestic difficulties but apparently had been living together as husband and wife. She left Norfolk and went to Texas to "visit" her parents. But she testified that this was not a "separation" in the divorce sense. She returned from Texas and during part of the September-January period, the husband was on shipboard duty at sea. In January, the wife left again but returned after the parties "talked." She stated at the time that she wanted to make the marriage "work." In February, she terminated a planned trip with her husband to a divorce lawyer, advising the husband that she had changed her mind and did not wish to separate "right now." Finally, about three weeks before the alleged offense, the husband began living aboard ship in port. At the time, the wife considered the marriage to be "over."

Evaluating the foregoing circumstances in the light most favorable to the Commonwealth, we think it is apparent that the wife subjectively considered the marriage fractured beyond repair when the parties separated in February. Nevertheless, we cannot say that this subjective intent was manifested objectively to the husband, in view of the wife's vacillating conduct, so that he per-

ceived, or reasonably should have perceived, that the marriage actually was ended.

The facts in *Weishaupt,* upon which the Attorney General relies in urging affirmance, are in sharp contrast to the circumstances of the present case. There, the wife moved out of the marital abode, taking with her the infant child of the parties. At the time of the offense, the parties had been separated continuously for 11 months and had not engaged in sexual relations during the period. There was no contact between the parties during the separation except telephone conversations concerning the child and chance meetings in public. During the period, the wife had consulted a divorce attorney who advised waiting until the parties were separated for a full year before filing suit for divorce. In sum, unlike the present case, the wife's marital conduct in *Weishaupt* during the pertinent period, viewed objectively, was unequivocal, definite, and certain; her conduct manifestly demonstrated that the marriage was in fact at an end and evidenced that the wife unilaterally had revoked her implied consent to marital intercourse. In *Weishaupt,* unlike this case, the Commonwealth proved beyond a reasonable doubt that the husband knew, or reasonably should have known, that the marriage was terminated *de facto.*

Accordingly, the judgment of conviction in this case will be reversed and the indictment will be dismissed.

*Reversed and final judgment.*

THOMAS, J., dissenting.

The victim in this case took a horrible beating. The integrity of her body was brutally invaded by her estranged husband. The facts in this appeal are such that the majority concedes that had the victim not been married to the assailant, the assailant would have been guilty of rape. Nevertheless, in an opinion which fails to give due precedential weight to the Court's recent decision in *Weishaupt v. Commonwealth,* 227 Va. 389, 315 S.E.2d 847 (1984), the majority concludes, in essence, that Edward Kizer had a right to do what he did. The majority opinion marks a retreat from the principles announced in *Weishaupt.*

The majority states that *Weishaupt* requires the proof of three factors before a husband can be convicted of raping his wife. Those factors are that the wife must have

1. .lived separate and apart from her husband,
2. refrained from voluntary sexual intercourse with her husband, and
3. in light of all the circumstances, conducted herself in a manner that establishes a *de facto* end to the marriage.

The majority concedes that the Commonwealth proved the first two factors. However, according to the majority, the evidence failed to establish that the wife conducted herself in a manner that established a *de facto* end to the marriage.

In my opinion, the majority's conclusion is wrong. Upon analysis, the majority's error appears to stem from two things: first, the majority has added a condition that was not stated in *Weishaupt*; second, the majority has failed to consider the facts in the light most favorable to the Commonwealth.

According to the majority, before a husband can be found guilty of raping his wife, the wife must make "manifest objectively to the husband" the wife's view that the marriage is at an end. *Weishaupt* nowhere requires that the wife make manifest *to her husband* that the marriage is at an end. *Weishaupt* requires only that the wife make manifest *to an objective observer* "her intent to terminate the marital relationship." 227 Va. at 405, 315 S.E.2d at 855. The difference is that, under the majority view, the trial court must place itself in the position of the estranged husband to determine whether the husband should have known that his wife considered the marriage over. Under *Weishaupt,* the court was not required to place itself in the husband's shoes; instead, it was called upon to occupy the more traditional posture of looking at the facts from the perspective of an objective observer to determine whether from that perspective the wife conducted herself in a manner that showed the marriage to be over. The perspective from which the facts are reviewed undoubtedly impacts upon the ultimate disposition of the case. The majority opinion works a subtle but important change in the perspective from which the facts are to be considered. This change is apparently designed to make it more difficult for a wife to establish the predicate necessary for conviction in a case of spousal rape.

The majority's modification of *Weishaupt* is less critical to the proper disposition of this appeal than is the majority's failure to consider the facts in the light most favorable to the Commonwealth. Of course, the majority submits that it has properly con-

sidered the facts. However, the conclusion it reaches indicates otherwise.

When viewed properly, the evidence shows the following: The couple was married on June 20, 1981. One child was born of the marriage. In September 1982, the couple began to experience marital difficulties. The couple did not engage in voluntary sexual relations from September 1982 through the attack which occurred in March 1983, a period of six months. The husband moved out of the marital abode in the middle of February, 1983. From that time to the attack there was neither sexual nor social contact between the parties. At the time the husband moved out, the parties discussed obtaining a legal separation. They even started on their way to visit a lawyer. The only reason they did not consult with a lawyer at that time was the fact that during the car ride the husband advised his estranged wife that his father was seriously ill. The wife decided to postpone the visit to the lawyer so as not to place an additional emotional burden upon her estranged husband while he tried to handle the problems associated with his father's illness. Further, prior to the attack, the husband filed suit to secure custody of the couple's child.

In my view, the foregoing facts meet either the original *Weishaupt* test or the modified test contained in the majority opinion. The single salient fact among all the facts and circumstances, and the one which makes this a stronger case for conviction than *Weishaupt,* is the husband's attempt to secure the custody of the couple's child. The majority mentions this fact but makes nothing of it, thus glossing over a very critical point.

In the normal course of events, husbands do not file custody suits unless they consider their marriages to be over. It is unrealistic to believe that the husband in this case would have sued for the custody of his child unless he thought the relationship with his wife was at an end. This husband demonstrated by his action in filing a custody suit that it was manifest to him that his marriage was over. The pendency of the custody suit added to the six-month absence of sexual relations and the one-month separation would lead any objective husband or impartial observer to conclude that the marriage in question was at an end.

Thus, in my opinion, the conviction for rape should be affirmed.

CARRICO, C.J., joins in this dissent.