## CIRCUIT COURT OF FREDERICK COUNTY

Joy H. Costello et al.

v.

Frederick County
Sanitation Authority et al.

April 9, 1999

Case No. (Chancery) 97-59

BY JUDGE JOHN J. McGRATH, JR.

The Court having previously overruled the Demurrers filed by the defendants and having granted an issue out of chancery (while reserving judgment on the question of whether the jury's verdict on the alleged equitable defense of laches pleaded by the defendants would be binding or advisory), the parties have briefed and argued a number of pre-trial issues that need to be decided prior to the commencement of the trial.

### I. *Factual Background*

The plaintiffs own three tracts of land comprising approximately 105 acres located in the County of Frederick, Virginia. The defendant, Town of Stephens City, owns an adjacent tract of land that contains a large quarry, and the Town signed a contract on June 8, 1992, whereby they permitted, *inter alia*, exploitation of the groundwater from this quarry by the defendant, Frederick County Sanitation Authority. Sometime starting in or about January 1994, Frederick County Sanitation Authority (hereinafter "Sanitation Authority") began to pump approximately two million gallons of water per

day from the quarry located adjacent to the plaintiffs' land. Plaintiffs allege that as a result of this pumping of water, the springs on the plaintiffs' property have dried up, the stream which crossed the property has also dried up, and that there has been a significant settling of the plaintiffs' land with the appearance of numerous sinkholes and related depressions.

Plaintiffs' Amended Bill of Complaint alleges seven separate grounds of recovery which can be summarized as follows:

| | |
|---|---|
| Count I: | Withdrawals of excessive and unreasonable amounts of subterranean water. |
| Count II: | Diversion of water by upper riparian owner. |
| Count III: | Breach of contract. |
| Count IV: | Nuisance. |
| Count V: | Negligent withdrawal of lateral and subadjacent support. |
| Count VI: | Violation of Amendment Five of the United States Constitution (inverse condemnation). |
| Count VII: | Violation of Article I, Section 2, of the Constitution of Virginia (inverse condemnation). |

## II. *Plaintiffs' Right for Commissioners to Determine the Value of Take*

As has been indicated above, this Court has previously granted an issue out of chancery as to all matters of an equitable nature which have been raised by the pleadings. The Court has reserved decision until after the jury verdicts are returned as to whether or not the verdict upon defense of laches, which has been pleaded by the defendants, will be considered a binding verdict.

Whether or not commissioners will be used to determine the value of the take depends on the nature of the proceeding in inverse condemnation. It is now well established in Virginia law that in inverse condemnation cases, the injured landowner has an option of proceeding either in an action at law for damages or using the statutory procedures set forth in § 8.01-187 of the Code of Virginia. See, *e.g., Bell Atlantic v. Arlington County*, 254 Va. 60 (1997). As stated in *Pasquotank Action Council, Inc. v. City of Virginia Beach*, 909 F. Supp. 376 (E.D. Va. 1995):

When a state provides an "adequate procedure" for obtaining just compensation, a property owner cannot claim a violation of the federal provision "until it has used the [state] procedure and been

denied just compensation." *Williamson Co. Regional Planning Comm. v. Hamilton Bank,* 473 U.S. 172, 196, 105 S. Ct. 3108, 3121, 87 L. Ed. 2d 126 (1985). Virginia provides two means, a self-executing provision in the state constitution, Va. Const. of 1970, art. I, § 11, *Burns v. Fairfax County Bd.,* 218 Va. 625, 238 S.E.2d 823, 825 (Va. 1977) (citing *Heldt v. Tunnel Dist.,* 196 Va. 477, 482, 84 S.E.2d 511, 515 (1954) (landowner may enforce right in common law action)), and a statutory mechanism. Va. Code Ann. §§ 8.01-184 and 8.01-187. The constitutional remedy and the statutory remedy are not mutually exclusive; either may be used by an aggrieved landowner. *Chaffinch v. Chesapeake & Potomac Tel. Co.,* 227 Va. 68, 313 S.E.2d 376, 378 (1984).

*Ibid.*

In reviewing the Virginia cases, it is clear that if a plaintiff brings an action using its common law remedy, as opposed to the declaratory judgment provision of § 8.01-187 of the Code of Virginia, then the action is an action at common law, and as such, the plaintiff is entitled to trial by jury on all issues joined. See, *e.g., Chaffinch v. Chesapeake & Potomac Tel. Co.,* 227 Va. 68 (1984); *Burns v. Board of Supervisors of Fairfax County,* 218 Va. 625 (1977); *Stroobants v. Fugate,* 209 Va. 275 (1968); *Heldt v. Tunnel Dist.,* 196 Va. 477 (1954).

Plaintiffs maintain that the intendment of their Bill of Complaint was to seek a declaratory judgment under the provisions of § 8.01-187 of the Code of Virginia and to thereby obtain the right to have the value of the inverse condemnation take determined by a panel of Commissioners. Although that is a perfectly appropriate manner of obtaining relief in an inverse condemnation case, the difficulty with that argument is that there is no indication whatsoever in the Bill of Complaint that has been filed that the plaintiff is proceeding under the declaratory judgment provision. To the contrary, the complaint appears to a state common law action for damages (see cases cited above), and as such, both the plaintiff and the defendant would be entitled to a determination of whether or not there has been a take and the value of the take by a binding civil jury verdict.

If the plaintiffs opt to proceed on the currently pleaded common law theory, then this is a law count which has been included within an equitable action, and the Court will order the matter be severed and transferred to the law side of the Court. (See § 8.01-270 of the Code of Virginia.) However, the law action will be consolidated for trial with the equitable action, and the jury

which will be sitting on the matters out of chancery in the equitable action will also sit as a law jury in this proceeding and render a binding verdict.

If the plaintiffs desire to recast their Bill of Complaint to proceed under the declaratory action provisions of § 8.01-187, the plaintiffs will be given twenty-one days from the date of this Order to file an appropriate amendment to the Bill of Complaint clearly asserting that they are proceeding under the declaratory judgment provision.

### III. *Defendants' Plea of the Statute of Limitations*

Both defendants have raised the affirmative defenses that plaintiff's claims are barred by the applicable statute of limitations and/or the doctrine of laches.

The defendants' position, which is not disputed by the plaintiffs, is that an inverse condemnation action is an action in quasi contract and that the three-year statute of limitation contained in § 8.01-246(4) of the Code of Virginia is applicable. See, *e.g., Prendergast v. Northern Va. Regional Park Auth.*, 227 Va. 190 (1984); *Burns v. Board of Supervisors*, 218 Va. 625 (1977). Aside from this general proposition of law, however, the parties' positions diverge dramatically.

Defendants argue that the Bill of Complaint in this case, which was filed on March 21, 1997, alleges in Paragraph 5 as follows:

(5) On or about January 19, 1994, the Authority began to draw large quantities of water from the premises. The natural water pressure existing in the artisan basin underlying the premises was thereby reduced to such an extent that the water no longer flowed naturally in the spring on the premises. In addition, the stream which crosses the premises has ceased flowing, and, on other occasions, the flow of water in said stream has been greatly diminished.

Defendants further argue that under § 8.01-230 of the Code of Virginia that in actions of this type (i.e., based on quasi contract), "the cause of action shall be deemed to accrue and the prescribed limitation period shall begin to run ... when the breach of contract or duty occurs in the case of damage to property and not when the resulting damage is discovered except where the relief sought is solely equitable ... ." The undisputed evidence developed in discovery apparently shows that since on or about January 14, 1994, the defendant, Sanitation Authority, has been pumping approximately two million gallons of water per day from the premises. Therefore, the defendants assert

that the inverse condemnation, which is in effect the breach of an implied contract, commenced on or about January 14, 1994, and that the Bill of Complaint, which was filed on March 27, 1997, was filed after three years had expired, and thus the action is barred. See, e.g., *Sides v. Richmond Machine Works, Inc.*, 406 F.2d 445 (4th Cir. 1969); *Smithfield Packing Co. v. Dunham-Bush, Inc.*, 416 F. Supp. 1156 (E.D. Va. 1976).

On the other hand, plaintiffs assert that although the pumping of two million gallons of water per day commenced in January 14, 1994, the adverse effects of such pumping on the surface and underground water supply and upon the lateral supports to their land did not occur until sometime after May of 1994. It is apparently plaintiff's argument that the inverse condemnation did not occur, and therefore, there was not a breach of an implied contract until the extraction of water had reached the level of being so "unreasonable" as to cause damage to the adjoining property.

The Court has not been able to locate any appellate precedent in Virginia concerning the statute of limitations on inverse condemnation when the damage has not been immediate and obvious. Although the issue was raised in *Richmond, Fredericksburg & Potomac RR. v. Metropolitan Washington Airport Auth.*, 251 Va. 201 (1996), the Supreme Court there did not find it necessary to reach the question of when the cause of action accrued.

However, it appears to this Court that the gravamen of the plaintiffs' Bill of Complaint in this action is not the same as a fairly normal breach of contract situation in which the contract is breached at a discreet point in time by a failure to perform or by improper performance and the damage merely occurs later or is discovered later. In the instant case, it may well be that the initial pumping of water from the defendant's property did not cause any damage to the adjoining landowner's property and therefore was not an inverse condemnation, and thus there had been no breach of an implied contract. Looked at another way, if the defendants had merely pumped a few thousand gallons of water per day, they may have been able to do that for eternity without adversely affecting the plaintiffs. Under the plaintiffs' theory of the case, it is only when defendant's extraction of water had reached such a level as to cause hydraulic damage to the adjoining landowners did the inverse condemnation and damage occur. This seems like a reasonable position; otherwise, an adjacent landowner would be required to file suit within three years from the pumping of underground water from adjoining lands just in case such pumping caused damages in the future.

Two circuit court opinions intimate that in inverse condemnation cases where the claim is for water damage, the statute of limitations does not begin to run until actual damage occurs or until the damage becomes "inevitable."

See *McConnell v. Board of Supervisors of Fairfax County*, 20 Va. Cir. 5 (Fairfax County 1989); *Deary v. Pethtel*, 10 Va. Cir. 181 (Wise County 1987). Therefore, this Court is of the view that in a case such as this, § 8.01-230 does not require the Court to hold that the statute of limitations began to run upon the first pumping of water from the defendant's property. The statute begins to run when the pumping damages the adjacent landowner's property.

However, the defendants do raise a legitimate point in that the wording of the Bill of Complaint as currently pleaded *appears* to allege that the damage occurred to the plaintiff's property and thus there was an implied breach of contract commencing in January of 1994. It now appears that this is not the theory of plaintiffs' case, and the plaintiffs are, therefore, given twenty-one days to file an Amended Motion for Judgment, if it can, stating the approximate date or dates upon which they contend the inverse condemnation first took place.

### IV. *Application of the English Rule or the American Rule*

As noted previously, this case involves allegations of interference with riparian rights to surface water (i.e., alleged interference with and the drying up of Stephens Run) and the interference with plaintiffs' claimed rights to subterranean water. Although the law of riparian rights in surface water may be reasonably complex, it is at least relatively stable and ascertainable from the decided Virginia cases. The law, however, concerning subterranean water is unsettled and was last dealt with by a Virginia appellate court in 1927 when the Supreme Court in *Clinchfield Coal Corp. v. Compton*, 148 Va. 437 (1927), described the "English Rule" and "American Rule" for dealing with legal rights and liabilities of subterranean water and then concluded:

> We are not called upon to decide between the different theories, but if the question shall again come before this Court, we shall feel free to consider it *de novo*.

*Ibid.* at p. 454.

In turn, the rules governing subterranean water may vary depending on whether the water is "percolating" water (i.e., water that seeps through the land without following a well-defined course or channel) or underground water that is flowing through a reasonably well-defined channel or course. See, e.g., *Miller v. Black Rock Springs Improvement Co.*, 99 Va. 747 (1901).

In a nutshell, the English Rule permits a landowner unlimited exploitation of the water found beneath his land. He may utilize as much of the

subterranean water as he cares to for any purpose irrespective of the effect upon adjoining landowners. See, e.g., Robert E. Beck, ed., *Water and Water Rights*, vol. 3, §§ 20.02, 20.03 (1991 ed.). Cf., *Henenger v. McGinnis*, 131 Va. 70 (1921). On the other hand, the American Rule permits the owner of the surface land to make reasonable use of subterranean percolating waters but prohibits the unreasonable withdrawal for sale or distribution for uses not connected with the beneficial enjoyment or ownership of the land from which it is taken. See, e.g., *Clinchfield Coal Corp. v. Compton*, 148 Va. 437, 451 (1927).

Not surprisingly, the Sanitation Authority urges the Court to adopt the English Rule, since it is the established English common law rule and the legislature has never modified it by statute. See § 1-10 of the Code of Virginia (the Common Law of England applies unless overruled by statute or "repugnant to the principles of the Bill of Rights and Constitution of the Commonwealth").

The plaintiffs, of course, argue that the English Rule is archaic (having been described by one American court which originally adopted the rule as being based on the premise the forces which move subterranean water "are so secret, occult and concealed that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertainty." *Frazier v. Brown*, 12 Ohio St. 294, 311 (1861)), and wholly unsuited to the situation existing in the United States, in general, and Virginia, in specific. The plaintiffs further argue that the English Rule has been rejected by more than forty states and the Restatement of Torts, Second, and argue in effect that English Rule is essentially inconsistent with the constitutional prohibition of taking property for public uses without just compensation. The condemnation of the absolute or English Rule is stated in *Water and Water Rights, supra*, at § 20.07(b)(2) in the following language:

> Where an aquifer is being mined, for example, the application of the absolute dominion doctrine approaches economic and ecologic suicide. It is proper to refer to all areas where groundwater withdrawals exceed the rate of recharge as mined areas, with mining indicating a greater rate of withdrawal than recharge along with the removal of groundwater from any possibility of natural storage.

Defendant, Town of Stephens City, argues that it is not necessary to determine which of the two theories applies because the Town contends that the evidence will show that the water that is pumped from its quarry is surface run-off which has collected in its quarry and is thus treated as pond water, and

since the Town owns the entire shoreline of the pond (i.e., the quarry), it has absolute dominion and control of the surface run-off.

There clearly are factual disputes concerning how and where the water, which is being pumped by the Sanitation Authority, comes from (i.e., surface run-off, underground springs, underground channels, underground seepage, etc.). At this stage in the proceeding, it is premature to reach a definitive answer to the question posed.

However, counsel are entitled to some guidance in the presentation of their case. Prudence would, therefore, dictate that the case be tried on the assumption that the rule which requires the largest set of facts be proven is the rule that will apply. In this proceeding, that would be the American Rule which would require proof of use of unreasonable amounts of water and/or unreasonable methods of extraction and/or unreasonable failure to take remedial steps, and/or sale of water off premises.

Although this issue need not and cannot be decided at this stage of the proceedings, it may assist the parties if the Court makes certain preliminary observations. The English Rule is clearly the "English common law" rule, but it was developed in the 19th century in a land which, if anything, has too much water as opposed to too little. The fact that the English Rule has been rejected by most American states and by the drafters of the Restatement of Torts, Second, is circumstantial evidence that the absolutist English rule in all of its Draconian splendor may not be a suitable rule for application in Virginia.

The one issue, however, which concerns the Court is the statutory adoption in Virginia of the English Common Law, Va. Code § 1-10. Because the English Rule is clearly now the common law of England and it has not been repealed or amended by the legislature, § 1-10 of the Code could be considered dispositive. The answer to this question requires a detailed examination of the history, intent, and purpose of § 1-10 and § 1-11 of the Code of Virginia.

As was detailed in the history of § 1-10 and § 1-11 set forth in *Foster v. Commonwealth*, 96 Va. 306 (1898):

> The convention of May, 1776, which declared our separation from England and framed the first Constitution of the State, ordained that "the common law of England, all statutes or acts of Parliament made in aid of the common law prior to the fourth year of the reign of King James the First, and which are of a general nature, not local to that kingdom, together with the several acts of the General Assembly of this colony now in force, so far as the same may consist with the

several ordinances, declarations, and resolutions of the general convention, shall be the rule of decision and shall be considered as in full force, until the same shall be altered by the legislative power of this colony." 9 Hen. Stat. 127, sec. 6; 13 *Id.* 23, ch. 17; and 1 R.C., ch. 38, 40, pp. 135, 136.

In the year of 1792, so much of the ordinance of 1776 as adopted the acts of Parliament of a general nature, made in aid of the common law prior to the fourth year of James the First, was repealed by the legislature; but that part of the ordinance of 1776, which established the common law until it should be altered by legislative power, has never been repealed.

*Id.* at pp. 308-09.

Although an initial reading of the 1776 statute may cause one to believe that the adaptation of the common law into the jurisprudence of the Commonwealth of Virginia was to be, like the adaptation of the Acts of Parliament, limited to that common law existing prior to the fourth year of the reign of James the First (which would be the year 1607 and the year in which the first permanent colony in Virginia was established at Jamestown), that does not appear to be the manner in which it has been treated by the Virginia courts. The appellate cases which from time to time have considered the matter do not distinguish as to the exact period from which they determine the common law of England. See, *e.g., Campbell v. Commonwealth,* 236 Va. 174 (1993); *Weishaupt v. Commonwealth,* 227 Va. 389 (1984); *Hanriot v. Sherwood,* 82 Va. 1 (1884). In fact, in *Weishaupt v. Commonwealth, supra,* the Virginia Supreme Court in determining the English common law looked, *inter alia,* at Queen's Bench cases decided in 1949, 1954, and 1974. 227 Va. at 398-399.

However, in reading virtually all of the cases decided by the Supreme Court of Virginia and the Court of Appeals of Virginia which deal with the proper interpretation of § 1-10 and how to interpret the common law of England, it is apparent that the true holdings in the cases are that for a common law rule to be binding upon the courts in the Commonwealth of Virginia, it must be one that is well established, that goes back in time "to the time that the memory of man runneth not to the contrary," and have a lasting and enduring value which is recognized by the English courts and presumably by many American courts. To some extent, this was the view set forth by the Supreme Court in *Weishaupt v. Commonwealth,* where it said:

The actual English common law rule, if applied directly to the facts of this case, would require us to reverse Weishaupt's conviction. But such a direct application is not possible. Before English common law can be applied in Virginia, it must be analyzed in light of Code § 1-10 and the cases interpreting that code section. According to the code, English common law cannot be applied if it is "repugnant to the principles of the Bill of Rights and the Constitution." Nor can it be applied if it is "altered by the General Assembly." In addition to the statutory provision, *Foster v. Commonwealth*, 96 Va. 306, 31 S.E. 503 (1898), sets forth yet another limitation on the use of English common law. In *Foster*, we considered the predecessor to Code § 1-10. We stated that though the statute, aside from its express limitations, appears to adopt English common law "generally, and without a qualification," this is not in fact the case. 96 Va. at 309, 31 S.E. at 504. The true rule is this:

"Such of [English common law] doctrines and principles as are *repugnant to the nature and character of our political system, or which the different and varied circumstances of our country render inapplicable to us*, are either not in force here, or must be so modified in their application as to adapt them to our condition." 96 Va. at 330, 31 S.E. at 505 (emphasis added).

Thus, by statute and case law, we are free, in essence, to adopt from English common law those principles that fit our way of life and to reject those which do not.

We must decide, therefore, whether the English rule, which permits revocation of the implied consent to marital sex but which refuses to grant that power to a woman acting unilaterally, is repugnant to the nature and character of our political system, contrary to statute, or whether the circumstances existing in Virginia render it inapplicable.

*Id*. at pp. 399-400.

In view of this analysis, it is necessary to examine the historical antecedents of the so-called English Rule of subterranean riparian rights. The so-called English common law rule was first announced in 1843 in *Acton v. Blundell*, 12 Mees. & W. 324, 152 Eng. Rep. 1228 (1843). The rule laid down in *Acton v. Blundell, supra*, however, changed the Common Law of England which had been in existence since 1808 when the case of *Balston v. Bensted*, 1 Camp. 463, 170 Eng. Rep. 1022 (1808), was

announced. This interesting change in the English Common Law was commented upon in *Water & Water Rights, supra,* as follows:

> In the mid-nineteenth century, courts in England and the United States were faced with what must have seemed to them an abruptly posed matter of first impression: what rights did anyone have in groundwater? ... .
>
> In retrospect, we see that Anglo-American common law generally opted for the absolute dominion, or English, rule first set forth in *Acton v. Blundell.* However, nothing was predetermined about this decision. Other rule choices were known, and later courts chose them rather than the absolute dominion rule. The available choices were varied, contradictory, credible, and difficult for judges who knew that these decisions would have important economic and social, as well as legal, consequences.
>
> Courts could have chosen to leave existing uses of water as rights protected fully by the law, subject to change only by contracts among landowners drawing upon the aquifer or by some prescriptive user among them. In the early nineteenth century case of *Balston v. Bensted,* Lord Ellenborough did just that ... .

*Id.* at § 20.03.

This Court is persuaded that the fact that the English Common Law was evolving over time to meet the industrial, political, and climatic conditions of the United Kingdom and that the current English Common Law Rule was not enunciated until 1848 indicate that this may well not be a rule of common law that is suitable for application in Virginia in the twenty-first century. By 1843 the Virginia courts were already developing the common law of Virginia in water rights cases. Although the Virginia courts looked to the evolving English Common Law for guidance (e.g., the Virginia Supreme Court, in *Miller v. Black Rock Springs Improvement Co.,* 99 Va. 747 (1901), cited with approval to the English case of *Acton v. Blundell, id.* p. 756), it does not appear that the Virginia courts have blindly followed every twist or turn of the British courts on the issue of riparian rights. Thus, the Supreme Court in *Clinchfield Coal Co. v. Compton,* 148 Va. 437 (1927), felt free in 1927 to state that the question of whether the English Rule or American Rule would be adopted in Virginia was an open question which would be addressed *de novo* if it arose again. *Id.* at p. 454. I assume this is the reason that Judge Powell felt at liberty to adopt the American Rule and reject the English Rule

in *Andrews v. Board of Supervisors of New Kent County* (Cir. Ct. New Kent County, 1994).

I do not decide this matter at this time, but I will require a substantial showing that the English Rule is consistent with the peculiar needs and requirements of Virginia as it approaches the twenty-first century. See, e.g., *Weishaupt v. Commonwealth*, 227 Va. 389 (1984); *U.S. F. & G. v. Carter*, 161 Va. 381 (1933); *Hanriot v. Sherwood*, 82 Va. 1 (1884); *Smith v. Thompson*, 8 Va. Cir. 231 (Fairfax County, 1986).

## V. *Bifurcation*

If the plaintiffs opt to amend their Bill of Complaint to request the bifurcated proceeding set forth in § 8.01-187, the matter will be by definition bifurcated, and the Commissioners will be empaneled after the discharge of the jury. If the plaintiffs continue with their common law action in inverse condemnation, all issues raised by the inverse condemnation issue will be tried in one trial to the jurors. In short, the only bifurcation which will take place will be that mandated by § 8.01-187.

## VI. *Conclusion*

The Court will issue its standard pre-trial order with the issues to be tried taken from the sketch order appended to the plaintiffs' praecipe filed on March 5, 1999.

The Clerk is directed to send attested copies of this Opinion and Order to Douglas K. Bumgardner, Esq., and Jesse J. Richardson, Jr., Esq., attorneys for the plaintiffs; Thomas G. Bell, Jr., Esq., attorney for defendant, Town of Stephens City; and Ron Lewis Napier, Esq., and Bradley R. Duncan, Esq., attorneys for Frederick County Sanitation Authority.