## CIRCUIT COURT OF FREDERICK COUNTY

Joy H. Costello et al.

v.

Frederick County
Sanitation Authority et al.

Case No. 97-59

BY JUDGE JOHN J. MCGRATH, JR.

November 3, 1999

This letter is in reference to the motion regarding the disqualification of all jurors who are currently customers of the Frederick County Sanitation District, one of the defendants in this action. I can find no Virginia law that *per se* disqualifies rate-payers or customers of a public service company from sitting on a jury for a case in which that company is a party. In fact, the Federal District Court for the Eastern District of Virginia has specifically stated that "even though it is clear there will be a financial impact upon the trier of fact, if that impact is insubstantial or insignificant, the trier of fact is not disqualified." *VEPCO v. Sun Shipbuilding & Dry Dock Co.*, 389 F. Supp. 568 (E.D. Va. 1975). That court further noted that in Virginia, jurors who are citizens of the Commonwealth may impose "substantial fines payable to the Commonwealth" and that commissioners may determine the award of condemnation despite the fact that it could affect the amount of tax they pay. *Id.* Accordingly, the Court for the Eastern District of Virginia declined to transfer jurisdiction of a case, in which VEPCO was the plaintiff, to a place where VEPCO customers would not be sitting on the jury. In so doing, they stated that to do so would "deny utilities their home venue in all except the most minor of cases." *Id.*

In light of the foregoing, this court will not grant the motion to excuse for cause all jurors who are customers of the Frederick County Sanitation District. However, counsel will be permitted to question potential jurors regarding any bias or prejudice that may arise from their being a customer and rate-payer of one of the defendants.

Due to the nature of the parties involved in this case and the fact that a large number of the potential jurors are customers of the Frederick County Sanitation District, the Clerk of the Court is directed to summon fifty veniremen for this case.

February 1, 2000

This case is currently before this court on Defendant, Stephens City's, motion for summary judgment and on Plaintiffs' Motion to Amend the Pre-trial Order. The Court will first address the summary judgment issue. The facts of this case are as follows. By deed of gift dated December 28, 1983, the Town of Stephens City ("the Town") acquired two parcels of land both containing abandoned quarries that the town was interested in using as potential sources of water supply. One parcel consisted of 135.879 acres and contained what is known as the "North Quarry" and the "Middle Quarry" and the second parcel of land, consisting of 18.501 acres, contained what is known as the "South Quarry."

In 1988, the town applied for a grant from Virginia Water Project, Inc., to fund a preliminary engineering study on the use of the quarries for a water supply for the town. Soon thereafter, in January 1989, after soliciting and receiving proposals from professional engineering firms to perform feasibility studies for the water supply, the town accepted the proposal of Patton, Harris, Rust & Associates. Although both the Frederick County Sanitation Authority ("the Authority") and the Town of Middletown agreed to contribute to the cost of the feasibility study, the Town of Middletown withdrew after Phase I of the study was finished.

In January 1990, the Town of Stephens City and the Authority entered into a Memorandum of Agreement which provided that "The Town will continue to manage the water study until the grant funds from Virginia Water Project are expended at which time the Authority shall manage and fund the balance of the study." The Memorandum also contained an attachment setting forth a draft of a basic agreement between the Authority and the Town for the lease of land and water rights by the Town to the Authority.

In April of 1991, Phase II of the study was finished and it was recommended that "the Water Treatment Plant have a capacity of 2 [million

gallons per day] with space provided for expansion to 3 [million gallons per day] in the future." It further recommended that after construction of the Water Treatment Plant, the South Quarry should be monitored to continue to evaluate the impact of withdrawing two million gallons per day from it. Also in 1991, the Authority approved a plan to construct a water treatment plant. The Authority had sole authority over hiring and management of engineers and architects; they reported to, consulted with, and worked at the direction of only the Authority.

In a June 8, 1992, contract, the Town granted the Authority an easement "to extract no more than 3,000,000 gallons per day (based on a monthly average) of ground water from quarries and related mines situated on" the parcel containing the South Quarry. The Town also agreed to purchase "all of its potable water requirements" from the Authority for twenty years or until the Authority's bond indebtedness for construction of water treatment facilities was retired. The Town's price for this water would be calculated by using a formula that is based on a percentage of the construction and operating costs of the Authority. This amount is determined and controlled solely by the Authority without input or control from the Town; it is not subject to negotiation or change. Furthermore, control of income and expenses from the plant and decisions that affect income and expenses, including daily volume to be drawn are decisions of the Authority alone; the Town has no input.

In October 1992, the June 8th contract was amended pursuant to the Authority's decision to move the water treatment plant to the North Quarry. In this amendment, the Town agreed to convey the 23.005 acres, adjoining and containing part of the North Quarry to the Authority; the Authority was also granted easements over Town property for waterlines. Furthermore, this amendment added an additional one percent discount on the Town's water costs in return for the conveyance of the property. Subsequently, the Authority began construction of the plant, independent of any control, input, or financing from the Town. Once the plant was up and running in January 1994, the Authority retained sole control and operation of the plant; this included making the decisions as to the daily volume of water withdrawn. The only input the Town had was the maximum limit of three million gallons per day as set in the 1992 contract. Finally in 1995, the Town granted the Authority an easement for the removal of water from the surface of the Middle Quarry and transportation of that water to the North Quarry. Despite this easement, however, all decisions as to the volume of water to be removed were made by the Authority.

Plaintiffs claim that in 1994, once the plant began to operate, the Authority was drawing large quantities of water from the three quarries and

from beneath Plaintiffs' land, causing the drying of a spring and a stream and the formation of sink holes on Plaintiffs' property. They further allege that this drawing of water constitutes withdrawal of excessive and unreasonable amounts of subterranean water, diversion of water by upper riparian owner, breach of contract, nuisance, negligent withdrawal of lateral and subjacent support, and constitutional takings of property. Plaintiffs claim that Defendant, Town, is liable to them because of independent actions on their part and because, they claim, the withdrawal of water and the water treatment plant is a "joint venture."[1] This Court will address each of these in turn.

Plaintiffs claim that Defendant Town is liable to them due to the Town's independent actions including "conceiving of the quarry project, acquiring the quarry properties, commissioning and funding the Phase I and Phase II reports, soliciting the Authority's participation in the project, and conveying the property and easements for the project." However, all the actions that Plaintiffs have cited as falling within this "independent action" category were in the planning stages of the water treatment facility. The Virginia Supreme Court has specifically stated that:

> the municipality in devising plans and systems for supplying the public with water, sewerage, and the like, exercises legislative duties involving the use of judgment and discretion, and it ought not to be held liable to civil actions for defects or want of efficiency of plans, at least during the formative or experimental stage of the enterprise.

*Stansbury v. Richmond*, 116 Va. 205, 209-10 (1914). In *Stansbury*, the Court found that the City of Richmond could not be held responsible for the "negligent adoption of a system of water supply." *Id.* The Court further stated that "the adoption of a plan for supplying a city … with water involves the exercise of a delegated governmental power" and the exercise of such a power is "not in the first instance reviewable by the courts." *Id.* at 207. In the case at hand, once the planning stage was over and construction began, the Town had no input as to what the Authority did. In fact, the 1992 contract specifically gave the Authority the right to "design and construct a water treatment plant …" and to "extract, purify, and deliver the said potable water to the Town and for Authority use at the expense of the Authority." (See, Contract of June 8, 1992.) The Town had no input as to how the Authority was to go about

---

[1]  A more detailed description of the allegations made by Plaintiff are explained in this Court's earlier opinion and order in *Costello v. Frederick County Sanitation Auth.*, 49 Va. Cir. 41.

extracting the water or how much they would be extracting. Because the Town's only "independent actions" were in this planning or "formative" stage, just as in *Stansbury*, the Town cannot be held responsible on this basis.

Plaintiffs also claim that the Town is liable because the Town and the Authority were involved in a "joint venture." A "joint venture" as defined by *Black's Law Dictionary* is:

> An association of persons or companies jointly undertaking some commercial enterprise; generally all contribute assets and share risks. It requires a community of interest in the performance of the subject matter, a right to direct and govern the policy in connection therewith, and duty, which may be altered by agreement to share both in profit and losses.

*Black's Law Dictionary*, 6th ed., 839. Similarly, the Virginia Supreme Court has stated that although there is not a "generally accepted definition of joint venture," it is usually found to exist where there is (1) mutual benefit, (2) "an express or implied understanding or agreement that they are to share in the profits or losses" and (3) each party shares in the management of the venture. See *Wells v. Whitaker*, 207 Va. 616, 626 (1966) (citing *Smith, Adm'r v. Grenadier*, 203 Va. 740, 744 (1962)); *Jackson Co. v. City of Norfolk*, 197 Va. 62, 67 (1955); *Jones v. Galleher & Co.*, 187 Va. 602, 609 (1948). More recently, the Federal Courts for both the Eastern District of Virginia and the Fourth Circuit have also come to the same conclusion regarding the elements of a joint venture. See *Shintom America Corp. v. Cellular Information Network, Inc.*, 825 F. Supp. 108 (E.D. Va. 1993); *Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 539 (4th Cir. 1988). Although Plaintiffs cite various Virginia cases for this contention that "little formality is required" to create a joint venture, they fail to note that in *Legum Furniture Corp. v. Levine*, the Court's explanation does not end there. See *Legum Furniture Corp. v. Levine*, 217 Va. 782 (1977). In fact, although the Court does state that "little formality is required," the Court continues on to state that courts must look to the conduct of the parties as well as to other facts to determine the existence of such a venture. *Legum* then cites *Wells v. Whitaker*, as a case providing "other facts" for the court to consider. These factors are those set out above.

The first element of a joint venture is that of a "community of interest." *Black's Law Dictionary* defines this term, as in relation to a "joint adventure," as "an interest common to both or all parties ...." *Black's Law Dictionary*, 6th ed., 280. Although both parties in the case at hand have an interest in the water plant, this interest is not one "common to both" as is required. The

Town's interest in the water facility is supplying healthy, treated water to their citizens at a good rate; the Authority's interest is to generate revenue money by selling water to the Town and other entities. Clearly, these interests are not the same. While it is noted that the Town does make money from providing this water to the citizens, this revenue comes from transmission and resale of the already treated water. The Authority makes its money by treating the water and then selling it to other entities. As Defendant, Town has correctly pointed out, if a contract and a "community of interest" were enough to establish a joint venture, all sales contracts would result in a finding of a joint venture. This Court finds that there was no "community of interest" in the case at hand.

The second element of a joint venture is that of sharing of the profits and losses. Plaintiffs contend that the Town does, in fact, share in the profits and losses of the water treatment facility because their water price is determined by using a formula based on a portion of the Authority's capital and operating costs. However, as the Virginia Supreme Court has stated, "profit" as defined in *Black's Law Dictionary* is "The advance in the price of goods sold beyond the cost of purchase. The gain made by the sale of produce or manufactures, after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed." *Oliver v. Halstead*, 196 Va. 992 (1955) (quoting *Black's Law Dictionary*, 3d ed.). Even though the Town got a discount on the water it purchased, this was not dependent on the profits that the Authority made; it was dependent on the capital and operating costs of the plant. The profit that the Authority makes on the water facility is dependent on the price they charge to all their customers, minus the operating costs etc. of the plant; this profit is not shared with the Town. The profit that the Town makes on the water is totally separate from that of the Authority; the town's profit is based on what the town charges its citizens, and this profit is one that the Authority does not share in. Neither entity has any control over the expenses or income of the other entity, nor can either entity affect the other's "profit" by dictating what they charge to their customers. Furthermore, even though the Town may enjoy a discounted price for their water, they have no say in what they are charged; the Authority notifies them each year what their rate will be, and this rate is not negotiable. It is clear to this Court that the second element of this three part test, that of a sharing of profits and losses, is not present in this case.

Finally, the third element for a "joint venture" is that of "mutual control and management." In the case at hand, since the plant has been up and running, the Town has had no input as to how business was carried out or how or how much water was pumped. Plaintiffs would like this court to believe that because the Town set a maximum per day limit of three million gallons,

that this means they shared in the control and management of the water facility. This simply is not the case. The three million gallon per day limit was set out in the 1992 contract, during the planning stages, and was based on the Phase I and Phase II studies that showed that the quarries and property could handle this amount. Although a maximum limit was agreed upon in the contract, the Town had no authority whatsoever to dictate just how much or how little the Authority actually pumped out per day. The Authority had the sole discretion to decide whether they would pump out one million or three million gallons, and there is nothing that the Town could do regarding this. The Authority is the only entity that can control the results reached in this case. The Town's only ongoing obligation is to purchase water from the Authority. Furthermore, the contract contains a detailed indemnification agreement which provides that each party shall be solely responsible for its own acts and omissions. This fact clearly demonstrates that the parties did not wish to be "joint venturers," and although the parties' intent is not the issue, it does demonstrate the set-up of this operation and the fact that the Town was not to have control over this facility after it was in operation. This Court finds that the uncontradicted facts show that the parties did not share in the control and management of this operation.

Because this court has found that not even one of the three elements required to form a joint venture were present here, it is clear that this undertaking was not a joint venture. Due to the fact that this Court has found no theory of recovery against the Defendant, Town, through independent acts or a joint venture, this Court cannot find that Defendant, Town, is potentially liable to the Plaintiffs in this case, and as such, this Court will grant Defendant Town's Motion for Summary Judgment.

The second issue this Court must decide is Plaintiffs' Motion to Amend the Pre-trial Order. Plaintiffs have moved to amend this order in one respect, to which the Defendant objects. Plaintiffs would like to include as an issue in this case, whether "Authority's failure to conduct an adequate pre-pumping investigation of the effect of the pumping on adjoining property" constituted negligence. The Defendant argues that this was the job of the independent contractor, Patton, Harris, Rust & Associates, hired to conduct studies on this land. Defendant claims that they cannot be held liable for the actions, negligent or not, of an independent contractor. Also, in that same section, Plaintiffs' request to add as an issue in the case "the failure of the Authority to adhere to the safe daily maximum pumping quantities as determined by their own study of the subject property." The Pre-trial Order entered in this case on April 9, 1999, sets forth as an issue, *inter alia*, "Were the acts and/or acts of omission of the ... Authority negligent." The requested amendments are

merely more detailed statements of this alleged negligence; there is no need to amend the pretrial order to specify this in detail. Therefore, the Motion for amendment is denied. However, Plaintiffs will be required to show that the proffered evidence is relevant to a viable theory of liability for negligence.

The Clerk of Court is directed to send certified copies of this order to Jesse J. Richardson, Jr., Esq., and Douglas K. Baumgardner, Esq., Counsel for Plaintiffs, Thomas G. Bell, Esq., Counsel for Defendant, Town of Stephens City, and Ron Lewis Napier, Esq., and Bradley R. Duncan, Esq., Counsel for Defendant, Frederick County Sanitation Authority.